494 F.2d 1074
 161 U.S.App.D.C. 155
 Bernice WILLIAMS
v.
STEUART MOTOR COMPANY, a corporation, Appellant, and Ford
Motor Company, a corporation.
Bernice WILLIAMS
v.
FORD MOTOR COMPANY, a corporation, Appellant, and Steuart
Motor Company, a corporation.
 Nos. 72-1302, 72-1306.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Oct. 19, 1973.
Decided Feb. 28, 1974.
 
 1
 Frank J. Martell, Washington, D.C., with whom Richard W. Galiher, William H. Clarke and William J. Donnelly, Jr., Washington, D.C., were on the brief, for appellant in No. 72-1306 and appellee in No. 72-1302.
 
 
 2
 John F. Mahoney, Jr., Washington, D.C., with whom Charles E. Pledger, Jr., Washington, D.C., was on the brief, for appellant in No. 72-1302 and appellee in No. 72-1306.
 
 
 3
 Solomon L. Margolis, Washington, D.C., with whom Stanley H. Kamerow, Allan L. Kamerow, David S. Greene and Joel I. Hoffman, Washington, D.C., were on the brief, for appellee Williams.
 
 
 4
 Before LEVENTHAL and ROBB, Circuit Judges, and MATTHEWS,* Senior United States District Judge for the United States District Court for the District of Columbia.
 
 MATTHEWS, Senior District Judge:
 
 5
 Bernice Williams, plaintiff in the District Court, sued Ford Motor Company (hereinafter Ford) and its authorized dealer, Steuart Motor Company (hereinafter Steuart), for damages for injuries sustained when a new Ford automobile suddenly plunged out of control, allegedly due to a defective accelerator return spring.* Both defendants were charged by plaintiff with breach of warranty and negligence. The case was submitted to the jury under both theories of liability. It returned a general verdict against both defendants and awarded plaintiff $204,243.09 in damages.
 
 
 6
 Cross-claims were filed by the defendants, respectively, against each other claiming full indemnity or contribution. The trial court denied Ford's cross-claim against Steuart in its entirety and granted indemnification to Steuart against Ford on Steuart's cross-claim.
 
 
 7
 The defendants have appealed, presenting these questions:
 
 
 8
 (1) Was there sufficient evidence of negligence or breach of warranty to justify the submission of plaintiff's claims against the defendants to the jury?
 
 
 9
 (2) Did the trial court commit reversible error in refusing to allow Dr. Robert Maddin to testify?(3) Was reversible error committed by the court in permitting counsel for Steuart to argue to the jury that a possible cause of the accident was the breaking of the accelerator return spring?
 
 
 10
 (4) Were the cross-claims of the defendants against each other for indemnity or contribution properly disposed of by the court?
 
 
 11
 (5) Was there an abuse of discretion by the court in refusing to set aside the jury verdict and grant a new trial as to defendant Ford, or in refusing to grant a new trial or remittitur as to defendant Steuart?
 
 
 12
 The record shows that the car in this case was manufactured by Ford, shipped to Steuart's plant in Washington, D.C., and from there driven a mile or so to Steuart's showroom in the same city. The record further shows that Steuart and Ford had an agreement whereby Steuart, before turning the car over to a purchaser, would inspect the car to check on its safety for sale and operation, and take such corrective action as might be indicated.
 
 
 13
 Plaintiff had told Steuart of her desire to turn in her old Ford car and to acquire a new 1966 Ford Fairlane. Following negotiations and by prearrangement with Steuart, plaintiff picked up the new Ford Fairlane here involved on Friday, December 3, 1965, at 7:00 p.m.
 
 
 14
 At the outset we note that when plaintiff acquired the new automobile there was by operation of law an implied warranty from both the manufacturer and the dealer that the vehicle was fit and suitable for the ordinary purposes for which an automobile is sold and used. D.C.Code 28:2-314 (1973 ed.).[1]
 
 
 15
 We recognize that an automobile manufacturer owes to the public a duty irrespective of contract to use reasonable care in manufacture and to make reasonable inspection of construction prior to placing his vehicle in the stream of commerce as the nature of an automobile is such that it is likely to place life and limb in peril when negligently made. This doctrine was enunciated by Judge (later Justice) Cardozo in the celebrated case of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (1916), and has the approval of the great weight of modern authority. Pierce v. Ford Motor Co., 190 F.2d 910 (4th Cir.), cert. denied, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951); Duckworth v. Ford Motor Co., 320 F.2d 130 (3rd Cir. 1963); Hupp Motor Car Corp. v. Wadsworth, 113 F.2d 827 (6th Cir. 1940); General Motors Corp. v. Johnson, 137 F.2d 320 (4th Cir. 1943); Johnson v. Cadillac Motor Car Co., 261 F. 878 (2nd Cir. 1919); Birdsong v. General Motors Corp., 99 F.Supp. 163 (E.D.Pa.1951); Restatement (Second) of Torts, 395; Prosser, handbook of the Law of Torts, Ch. 17, 96 (4th ed.). It was the duty of Steuart, the dealer, to exercise reasonable care in making the pre-delivery inspection and servicing of the car which it had agreed to perform.
 
 
 16
 In light of these principles, we discuss now the evidence which Ford and Steuart contend was insufficient to justify the submission to the jury of the plaintiff's claims of breach of warranty and negligence.
 
 
 17
 * The plaintiff's testimony was as follows: After receiving the car from Steuart, Mr. Leftwich, a friend, drove the car home for her and noted a sticky accelerator pedal, and that the idle was faster than normal, all of which he attributed to the newness of the car. The couple had dinner and went in the new car to spend the evening with friends. Returning home, plaintiff drove the new car for the first time, experiencing no problem with the car's operation other than a fast idle. She parked the car in the alley parking place next to her apartment building. Back in her apartment, however, she glanced out and noted that the rear end of the car was projecting slightly into the alley. She went out to repark the car in a safer position.
 
 
 18
 After starting the car, plaintiff moved her right foot from the accelerator pedal to the brake pedal, and moved her left foot from the brake pedal to the floor. Then she released the emergency brake with her left hand and used her right hand to shift the gear lever from neutral into drive position at which time the car plunged forward out of control even though she had her foot mashed down tightly on the brake pedal, and the car crashed into a concrete embankment about 75 to 100 feet away.
 
 
 19
 James McMillan, who lived across the street from plaintiff, testified that he was up at the time of the accident, heard the screeching of brakes, the racing of an engine, the 'lamentation' of the vehicle, and a sudden boom or crash; that he immediately went to the crash scene, saw plaintiff and noted that broken bones were protruding from her left ankle; that he saw skidmarks in the alley leading to the rear wheels of plaintiff's car; and that the car remained in its crash position over the weekend.
 
 
 20
 Hatie Wilborn, occupant of an apartment directly above that of plaintiff, testified that she was awakened by the sound of screeching brakes and went to her window where she could smell the odor of burning rubber; that later she went to the accident scene and observed skidmarks leading to the crashed vehicle.
 
 
 21
 Mr. Leftwich, plaintiff's friend, who had driven the car Friday evening, testified that on his return to plaintiff's apartment about six o'clock Saturday morning he saw the car in the alley in its crash position and examined it inside and out. He noted that the accelerator pedal was limp on the floor so that he could pick it up and on its release it would drop flat against the floor. He also saw skidmarks leading to the rear of the car and pointed them out in photographs introduced in evidence.
 
 
 22
 It was undisputed that the car had two miles on its odometer at the time it was delivered to plaintiff and 17 miles at the time of the crash.
 
 
 23
 Harry J. Brandt, an estimator for defendant Steuart, called by plaintiff, gave this testimony: He saw the car after it was towed into Steuart's service lane the Monday following the crash. He examined the accelerator return spring under the air cleaner as well as the rest of the engine compartment. The accelerator return spring attaches at two points, i.e., the bellcrank and the carburetor, but was unattached and hanging loose at the bellcrank on plaintiff's car. With the spring off at the bellcrank the car would operate at an excessive speed and would not be in proper operating condition.
 
 
 24
 The Pre-Delivery Service sheet provided by Ford for its dealers contained a list of services to be performed by Steuart prior to delivering the car so as to check on whether the car was safe for sale and operation.
 
 
 25
 Richard Vanderhoof was called by plaintiff and qualified as an expert automotive mechanic. He testified that he had prepared the model being used at trial as Plaintiff's Exhibit 39, that it correctly and accurately represented the engine in question, that he had not seen plaintiff's actual car but had seen photographs of it, that he was familiar with this model and type car, its specifications and mechanical operation. He explained the workings of the car and its transmission, carburetor and accelerator systems. He said he had seen the schematic drawings provided by Ford of the car's accelerator linkage system, as well as the Pre-Delivery Check List provided by Ford to Steuart.
 
 
 26
 On the basis of a hypothetical question by plaintiff's counsel, Mr. Vanderhoof expressed an opinion that the probable cause of the car running away in the manner described was that the accelerator return spring came off at the bellcrank, resulting in the gas pedal pulling the throttle open and racing the engine. He also expressed the opinion that the probable cause of the spring coming off was an improper installation of the spring.
 
 
 27
 Further, Mr. Vanderhoof testified that the accelerator return spring will not come off in the normal operation of the car if the spring is properly installed. It was his opinion that the shifting of the gear from neutral to drive position caused the engine in the plaintiff's car to torque, thus causing the improperly installed spring to dislodge.[2] He stated that the accelerator return spring can be improperly installed and still work, but sooner or later will either come off or seat itself properly, and that it is impossible to predict the movement which will finally cause the spring to dislodge. In his opinion the spring in plaintiff's car did not come off in the crash of the vehicle, but prior thereto since the facts indicated that the car went out of control before the accident.
 
 
 28
 Concerning the services set out on the Pre-Delivery Service Sheet, Mr. Vanderhoof expressed the opinion that, had they been properly performed by Steuart, the improper installation of the spring should have been discovered; and that, had he performed the services described on the above-mentioned sheet, he would have discovered the fast idle and sticking accelerator pedal, which would have led him to the accelerator linkage system and the spring.[3]
 
 
 29
 The principal witness for Ford was Robert Lee Frey, a products quality engineer employed by Ford. He testified that he oversees the quality of all the products and component parts that go into Ford automobiles, trucks and tractors, and that he understands the assembly processes for the type of car purchased by plaintiff. He had never seen, he said, the accelerator return spring which was on the plaintiff's car, and did not know what became of it after it was replaced by Steuart following the crash.
 
 
 30
 According to Mr. Frey there are only two ways for the accelerator return spring to be released. One way is for someone to release it manually, and the other would be under a dynamic impact situation. As an expert witness responding to a hypothetical question propounded by Ford's counsel, Mr. Frey's opinion (contrary to that of plaintiff's expert) was that the accelerator return spring on the plaintiff's car probably became dislodged or unhooked from its bellcrank hole during the severe impact at the time of the crash.[4]
 
 
 31
 Mr. Frey explained that every operation at the Ford plant is written up on an operation sheet, that the engine in a car is put together on the assembly line, that each car is driven in the plant a few car lengths by six to eight different workers, starting and stopping the engine so as to test its performance, and that Ford keeps records of all inspections on the motor as it goes along the assembly line. Upon being asked about the availability of such records for the plaintiff's car, Mr. Frey indicated that they could not be produced because they were retained only for a year or so and then destroyed.
 
 
 32
 In a case of this sort, the plaintiff almost never has any direct proof of what occurred in an enclosed mechanism to cause its malfunction, and must resort to circumstantial evidence.[5] Breach of warranty and negligence may be established by direct or circumstantial evidence or by a combination of the two kinds of evidence.
 
 
 33
 We conclude that there was an adequate evidentiary basis for submitting to the jury the breach of warranty and negligence claims of the plaintiff.
 
 II
 
 34
 We turn now to the claim that the court improperly refused to allow Dr. Robert Maddin, Director of the School of Metallurgy and Material Science, University of Pennsylvania, to testify for the defense.
 
 
 35
 Under the Pre-Trial Order the names of all prospective witnesses exclusive of impeachment or rebuttal witnesses were to be listed with the clerk by a specified time prior to trial. Dr. Maddin's name was not on any such list.
 
 
 36
 In proffering Dr. Maddin as a witness the defendants claimed surprise. They said that a 'new and novel theory of liability had been injected into the case through the testimony of plaintiff's expert, Mr. Vanderhoof, namely, the improper mounting of the accelerator return spring.' Yet the record shows that both defendants had deposed Mr. Vanderhoof prior to trial, and that in the Pre-Trial proceeding and at trial plaintiff clearly relied on a charge of 'Improper assembly of accelerator system, particularly the accelerator return spring.'
 
 
 37
 The testimony of Dr. Maddin was also sought on the ground that the model-- Plaintiff's Exhibit 39-- was an altered one. This requires a little background.
 
 
 38
 When Harry Brandt, Steuart's employee, was called by plaintiff, he was asked to draw a diagram of the motor and parts in question. Noting Brandt's inability to comply, the trail judge suggested that the parties and counsel examine plaintiff's model and consider agreeing to its use. This was done. The model was examined by Mr. Frey. Ford's expert, among others. Thereafter it was received without objection as Plaintiff's Exhibit 39,[6] and was used by all counsel.
 
 
 39
 Mr. Vanderhoof, plaintiff's expert, in testifying used the model for explanation but at no time on direct examination was he asked to perform any demonstration. However, on cross-examination by counsel for Steuart, mr. Vanderhoof was asked to demonstrate how the spring could be improperly installed so as to come off during operation and he complied.[7] Then he was asked to work the linkage, which he did a few times, to demonstrate how the accelerator return spring can be improperly installed and yet permit the vehicle to function pending a movement causing dislodgment of the spring.
 
 
 40
 After completion of the cross-examination of Mr. Vanderhoof, which crossexamination did not explore the possibility of the bellcrank on the model differing from the bellcrank on a new car or the bellcrank which was actually on the plaintiff's car, the plaintiff rested her case and Mr. Vanderhoof was released.
 
 
 41
 At this point counsel for defendants advised the court that during the previous evening representatives of Ford had examined the aperture of the bellcrank as it was assembled in the model, noting that the inside diameter of the bellcrank aperture was worn and did not resemble that of a new part of one which had been used for only 17 miles (the mileage on plaintiff's vehicle at the time of the accident). In this situation, Dr. Maddin, having been contacted, made an examination of the bellcrank aperture in the model.
 
 
 42
 Counsel for defendants told the court that if allowed to testify Dr. Maddin would say 'that the amount of wear shown on what is marked as plaintiff's Exhibit 39 is abnormal for a car with 17 miles on it; and that is why that experiment was not a valid experiment,' referring to the experiment requested by defendant Steuart wherein Mr. Vanderhoof showed how a spring could be improperly installed and the linkage worked without such spring coming unattached.
 
 
 43
 In sustaining plaintiff's objection to Dr. Maddin's testifying, the trial judge stated that it would be unfair to plaintiff since her expert, who had assembled the model, had been released; that the defendants were attempting to renege of their stipulation as to the model being a replica of the parts in question; that the examination of the model by Dr. Maddin and Ford representatives had taken place out of the presence of and without notice to plaintiff's counsel or to the court; that it would require plaintiff to seek out a metallurgist to counter such testimony at a late time in trial; and that Dr. Maddin was not on the pre-trial list of either defendant as a prospective witness.
 
 
 44
 Notwithstanding the exclusion of Dr. Maddin as a witness, the court, over plaintiff's objection, permitted the same evidence that was proffered for Dr. Maddin to be fully brought out through Mr. Frey, Ford's expert witness. A model produced by Ford was introduced in evidence and the jury was personally permitted to examine the parts of each model through a magnifying glass.
 
 
 45
 Under Rule 61 of the Federal Rules of Civil Procedure, no error in either the admission or exclusion of evidence is ground for granting a new trial unless refusal to take such action appears to the court inconsistent with substantial justice. Since the same evidence Ford sought to introduce through Dr. Maddin was adduced by Ford's expert, Mr. Frey, we conclude that the court's ruling as to Dr. Maddin, if erroneous, borders on harmless error.
 
 
 46
 There is a residual possibility that the jury verdict might have been different if the same testimony had been given by a witness who was independent in the sense of having no on-going relationship with a party. But the comparably independent witness called by plaintiff was released, after defense counsel announced cross-examination was concluded, at a time when there was no indication that defense counsel either proposed to call an independent expert witness not previously listed, or proposed to modify the previous stipulation concerning the model used by plaintiff's witness. When the trial judge gave defense counsel some latitude in questioning Ford's expert notwithstanding the stipulation, we think he made a reasonable accomodation in the interest of justice and see no reversible error.
 
 III
 
 47
 We find without merit the claim of Ford's counsel that the court erred in permitting other counsel to argue to the jury that a possible cause of the accident was the breaking of the accelerator return spring.[8]
 
 
 48
 It was established that for the car to operate properly (and it did operate after a fashion for 17 miles), the accelerator return spring must be attached in some way at both ends. That the spring was unattached at one end after the accident was clearly shown. It follows that there must have been a time and a cause for the disengagement of the spring.
 
 
 49
 The record shows that the spring on plaintiff's car was replaced. According to common experience, replacement of a good automobile part is not made. Only one witness-- Mr. Brandt, Steuart's employee-- actually saw the spring on plaintiff's car, this being after the accident. He noted that it was then unattached at one end and hanging loose, but he testified that he did not examine it to see why it was off at the bellcrank, and that he could not recall whether or not anything was wrong with the spring itself. In one of two estimates Brandt made of things to be done to rehabilitate plaintiff's car, the replacement of the spring was indicated but the reason therefor was not noted or remembered by Brandt. He was unable to say what became of the spring removed from plaintiff's car even though at the time of removal it was in Steuart's possession.
 
 
 50
 It is true that there was no direct proof that the spring broke. Even so, from the underlying facts and circumstances in evidence and the witnesses' testimony as a whole, we do not think permissible latitude was exceeded when, in argument to the jury, Steuart's counsel touched on the possibility that the spring snapped.[9]
 
 IV
 
 51
 The case having been submitted to the jury on the issues of breach of warranty and negligence as to each defendant, and the jury verdict having been a general one against both defendants, Ford maintains that the trial court erred in its rulings on the respective cross-claims of the defendants when it denied Ford's cross-claim against Steuart in its entirety and granted Steuart's cross-claim for complete indemnity.
 
 
 52
 Ford's position is that if Steuart and Ford were joint tort-feasors, Ford's negligence was passive or secondary while Steuart's negligence was active or primary (i.e., Steuart's failure to discover and correct the defective condition of the car during Steuart's pre-delivery inspection). Accordingly, Ford argues that, as the passive or secondary tortfeasor, Ford is entitled to full indemnity from Steuart.[10]
 
 
 53
 Alternatively, Ford asserts entitlement to contribution from Steuart, alleging that the negligence of both tort-feasors contributed equally to causing the accident.[11]
 
 
 54
 Challenging Ford's version of its own negligence as passive or secondary, Steuart asserts that Ford's negligence was active or primary and that of Steuart passive or secondary.
 
 
 55
 Further Steuart alleges that plaintiff's judgment, although against both Ford and Steuart, was predicated on a defect in the car's manufacture by Ford; that Steuart's cross-claim against Ford was an indemnity action for breach of warranty rather than an action based on tort; that the only defense raised by Ford to Steuart's cross-claim was that Steuart failed to discover and remedy Ford's defect in manufacture; and that such defense cannot excuse Ford's own breach of warranty of fitness of the car involved.
 
 
 56
 Thus Steuart maintains that the trial court correctly granted it full indemnity based on Ford's breach of warranty to Steuart as to the merchantable quality of the car in question.
 
 
 57
 The principle of primary versus secondary negligence and the consequences flowing therefrom were dealt with in Washington Gas Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712 (1896). There a pedestrian had been injured when she stepped into a 'deep and dangerous hole' in the sidewalk of a city street, and had recovered a judgment against the District of Columbia on the ground that the District had breached its duty to maintain the street in a reasonably safe condition. The District then sued the Gas Company for indemnity asserting that the 'deep and dangerous hole' causing the pedestrian's injury was an open gas box placed in the sidewalk by the company for its own use and benefit and which it was its duty to maintain, that by neglect of this duty the Company allowed the box to get out of repair and become unsafe. The Supreme Court held that the Gas Company was the principal delinquent and, therefore, liable to its co-delinquent for the damages paid the pedestrian.
 
 
 58
 The case at bar is analogous to that of Ryan Co. v. Pan-Atlantic Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). There a stevedoring contractor had agreed to perform all of a shipowner's stevedoring operations in coastwise service. During the unloading of the ship a roll of pulpwood weighing over three thousand pounds, which had been insufficiently secured when stored by the stevedoring contractor, broke loose and struck and injured one Palazzolo, an employee of the contractor. Palazzolo sued the shipowner, obtaining a judgment for $75,000, and the shipowner then sued the stevedoring contractor for indemnity. The right of the shipowner to indemnification from the stevedoring contractor was upheld by the Supreme Court on the basis of the contractor's breach of warranty of workmanlike service in stowing the cargo.
 
 
 59
 The argument made here by Ford against the indemnification of Steuart is strikingly similar to an argument made in Ryan by the stevedoring contractor against indemnification of the shipowner. Here Ford says that indemnification of Steuart should be barred because of Steuart's failure to discover and remedy the defect in the automobile during it's pre-delivery inspection. In Ryan the stevedoring contractor pointed out that the shipowner had an obligation to supervise the stowage and to reject unsafe stowage of the cargo, and did not do so, and therefore, that the shipowner should be barred from recovery from the stevedoring contractor of any damage caused by the contractor's uncorrected failure to store the pulpwood roll in a reasonably safe manner.
 
 
 60
 The Supreme Court responded to the above suggestion of the stevedoring contractor as follows:
 
 
 61
 'Accepting the facts and obligations as above stated, the shipowner's (indemnity) claim against the contractor should not thereby be defeated. Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. (The shipowner's) failure to discover and correct (the stevedoring contractor's) own breach of contract cannot here excuse that breach.' 350 U.S. 124 at pp. 134, 135, 76 S.Ct. at p. 238.
 
 
 62
 As to Ford's alternative claim of a right to contribution against Steuart, Ford asserts that strong support is found in Duckworth v. Ford Motor Company, 320 F.2d 130 (3rd Cir. 1963). It is true that in Duckworth the automobile manufacturer, after being found liable to a buyer because of personal injuries caused by a defective steering assembly, was allowed to enforce contribution from the selling dealer.
 
 
 63
 But the circumstances existent in Duckworth are not here present. There the purchaser had specifically directed the attention of the dealer to the failure of the steering wheel to act properly, and the dealer had examined it, and advised the purchaser that, after having checked it, the steering wheel was all right. In that situation the dealer was found negligent in failing to make proper repairs to the defective assembly, and hence, the manufacturer and the dealer were deemed joint tortfeasors, and contribution was permitted. In the case at bar no complaint about operation of plaintiff's car was ever transmitted to Steuart prior to the crash, and there is no evidence to show that Steuart did anything to the motor or to the parts in question.
 
 
 64
 While the jury found breach of warranty and negligence as to each defendant, we think the trial court rightly granted full indemnity to Steuart against Ford. Ordinarily a dealer may recover from the manufacturer losses occasioned by the latter's breach of warranty, and the present case poses no exception. Clearly Steuart's breach of warranty to plaintiff rested on Ford's breach of warranty to Steuart. Although Steuart failed to discover and correct Ford's defect in manufacture before sale of the car, this negligence on Steuart's part does not excuse Ford's breach. The principal duty of care and vigilance against defective workmanship was on Ford, and, as the primary wrongdoer, Ford was properly required to indemnify Steuart whose negligence was passive.
 
 V
 
 65
 The final contention of the defendants is that the jury's verdict is excessive and that the trial court abused its discretion in refusing to set it aside and grant a new trial.
 
 
 66
 It is the view of this court that 'Two factors unite to favor very restricted reviews of * * * orders (denying a new trial on the ground of an excessive verdict). The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages. This second factor is further weighted by the constitutional allocation to the jury of questions of fact.' Taylor v. Washington Terminal Company, 133 U.S.App.D.C. 110, 113, 409 F.2d 145, 148 (1969).
 
 
 67
 Concerning the amount of the damages, 'a verdict should not be set aside as excessive unless the Court is of the opinion that it is beyond all reason, or, as is sometimes said, is so great as to shock the conscience. * * * The test is whether the verdict is so unreasonably high as to result in a miscarriage of justice * * *.' Frank v. Atlantic Greyhound Corp., 172 F.Supp. 190, 191 (D.D.C.1959). The test has also been stated as whether the verdict 'is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.' Graling v. Reilly, 214 F.Supp. 234, 235 (D.D.C.1963).
 
 
 68
 Prior to the accident, plaintiff was an active, self-supporting woman in her late thirties with an eighth grade education. She had worked continuously for 27 years in manual jobs and, immediately preceding the accident, was employed full time as a sheet mangler in the laundry of a hospital. This work required her to stand all day but she enjoyed it, did her own housework, and engaged in many recreational activities, including bowling, swimming, riding horses, boating in her own boat, dancing and going on picnics.
 
 
 69
 Following the crash on December 4, 1965, plaintiff was taken by ambulance to Casualty Hospital where her injuries were diagnosed as 'a fractured skull, a lacerated wound of the forehead, (and) a compound comminuted fracture of the left ankle.'[12]
 
 
 70
 In all plaintiff had three separate hospitalizations because of her injuries, each involving surgery.
 
 
 71
 The initial hospitalization lasted seven weeks. The cut on plaintiff's forehead of 3 1/2 inches was stitched. The shattered bones of her left ankle were put back into place. All three malleola having been snapped off in the accident, two were sewn into place, and one had to be kept in place with a bone screw. Her leg was put into a cast. She underwent excruciating pain, and a steady stream of medication was given to alleviate her suffering. She was bedridden for a month and unable to move. Physical therapy was commenced on January 3, 1966, to teach plaintiff to walk on crutches.
 
 
 72
 On January 22, 1966, plaintiff, still on crutches with her leg in a cast and experiencing extreme discomfort, returned to her apartment. Her leg smelled, and required draining, cleansing and medication through a window in the incision site. It was difficult for her to negotiate the stairways in her apartment building but she made visits to her physician. In late July 1966, she returned to work, performing light duty.
 
 
 73
 However, the pain in her ankle persisted, and x-rays revealed that the ankle bone had not knit after almost 14 months. She was readmitted to the hospital. During this second hospitalization-- January 22 through January 27, 1967,-- an operation was performed to remove the bone screw, with the hope that then the bone would knit. Another cast was put on, and again plaintiff went home to recuperate. During the interval between the second and third hospitalizations, plaintiff continued to experience leg pain, coupled with hip discomfort. Nevertheless, still on crutches and with a cast on her leg, she resumed light duty work the last of March, 1967.
 
 
 74
 The ankle bone failed to knit, however, and the leg pain continued. Plaintiff was hospitalized again from October 8 through October 25, 1967. She underwent surgery for the third time. From her left tibia, bone was removed and fused into the left ankle joint and a bone screw inserted. Following this operation plaintiff spent more than 13 months in a bent leg cast.[13] When this cast was removed, the leg was swollen, scarred and painful, and there was substantial atrophy of the left leg, loss of strength and traumatic arthritis. The bone had knit but her ankle was left stiff and inflexible.
 
 
 75
 Although plaintiff made an effort to work following each of her first two bouts with surgery, she could not resume her manual labor after the October 1967 fusion and the 13 months in a bent leg cast which ended in November 1968.
 
 
 76
 In the spring of 1969, plaintiff's physician placed her in a brace which was difficult to put on and take off, but which enabled her to move about with the use of a cane.
 
 
 77
 There was medical testimony that plaintiff's left leg was worse at the time of trial than it had been the preceding year, that her condition was getting progressively worse, and that her injuries were permanent in nature.
 
 
 78
 Included as permanent injuries are loss of motion in plaintiff's left ankle, shortening of her left leg, tilting of her pelvis, traumatic arthritis, swelling and pain in the left and right legs, knees and ankles,[14] atrophy of the left leg, discomfort in her back, numbness of the forehead, 15 and headaches caused by the skull fracture.
 
 
 79
 As previously stated, the jury's verdict was for $204,243.09. The medical and hospital expense totaled $7,482.02. The loss of earnings from the date of the accident to the time of trial amounted to $21,606. The life expectancy of a woman of plaintiff's age and race was given as 27.8 years, and loss of earnings from trial to age 65, reduced to present value, was figured by an economist at $76,384.21. These three items total $105,472.23. Presumably, the remainder of the award-- $98,770.86-- was principally for pain and suffering.
 
 
 80
 Considering the nature of plaintiff's injuries, that most if not all of them are permanent, that she suffered throughout a period of years great pain and anguish, that she is likely to suffer pain and discomfort in the future from the same cause, that the crippling effects of her injuries have ended the capacity she had for manual work and have terminated her enjoyment of life in the manner to which she was accustomed, we do not find the verdict of the jury excessive.
 
 
 81
 Accordingly, we affirm the judgments of the District Court.
 
 
 82
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(c)
 
 
 **
 The parties will be referred to as they were in the trial court
 
 
 [1]
 'Warranties developed in the law in the interest of and to protect the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose.' Henningsen v. Bloomified Motors, Inc., 32 N.J. 358, 375, 161 A.2d 69, 78 (1960)
 See also Picker X-Ray Corp. v. General Motors Corp., D.C.App., 185 A.2d 919 (1962).
 
 
 [2]
 Questioned as to why in his opinion the spring dislodged when plaintiff shifted from neutral to drive position, Mr. Vanderhoof, pointing to the model, said:
 'This is supposed to be the fire wall of the car right here (indicating). When you put the car in gear, especially if it has a fast idle, it has a tendency, the whole engine, to jerk this way (demonstrating) and this being hooked to the fire wall, the fire wall does not move. This will stay stationary right here (indicating). The front piece shudders and this jolts the whole mechanism.' Joint Appendix, p. 205.
 
 
 [3]
 The plaintiff also adduced evidence as to her injuries and medical treatment. We later discuss this aspect of the case
 
 
 [4]
 He did not explain the action of the car prior to the crash, that is, the racing of the engine through the alley, despite plaintiff's strong application of the brake pedal. Neither did he explain the skidmarks in the alley leading to the rear of plaintiff's car
 
 
 [5]
 Simpson v. Logan Motor Company, D.C.App., 192 A.2d 122 (1963); Congressional Insurance Co. v. Ford Motor Co., D.C.App., 198 A.2d 918 (1964)
 
 
 [6]
 At that time plaintiff's attorney advised the jury: '. . . there is being offered into evidence this model-- which all the parties will be utilizing, hopefully, to explain various facets of this case to you. This is a replica of the applicable areas of the block, the carburetor and so forth on a 1966 Ford, not the 1966 Ford in question but substantially or practically identical to it for your purposes.' Joint Appendix, p. 147
 
 
 [7]
 The witness, asked to explain what he did, said: 'I just hooked the spring up. I did not completely thread it through the hole all the way' at the bellcrank. In the opinion of the witness the spring was installed like that. Joint Appendix, p. 190
 
 
 [8]
 Only counsel for defendant Steuart so argued to the jury, suggesting that if the spring broke Steuart would have no responsibility since a careful pre-delivery inspection could not 'determine any inherent weakness' in the spring. Joint Appendix, pp. 271-73. Responding, plaintiff's counsel told the jury that while defendant Steuart's theory of the spring snapping did not agree with plaintiff's version of what happened, nevertheless, should the jury reach the conclusion that the spring did snap, then both defendants would be liable for breach of warranty. Joint Appendix, p. 278
 
 
 [9]
 In Lavender v. Kurn, 327 U.S. 645, at page 653, 66 S.Ct. 740, at page 744, 90 L.ed. 916 (1946), the Supreme Court said: 'Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.'
 
 
 [10]
 The following classification of joint tortfeasors into categories is stated in Nordstrom v. District of Columbia, 213 F.Supp. 315, at p. 318 (1963), rev'd on other grounds, 117 U.S.App.D.C. 165, 327 F.2d 863 (1963):
 'First, in some instances joint tort-feasors commit one act of negligence in concert. Naturally, no right of indemnity exists as among them. The second class comprises situations in which the joint tort-feasors are guilty of separate tortious acts, either simultaneously or in chronological sequence, the several acts in combination constituting proximate causes and leading to the plaintiff's injuries. This class may, in turn, be subdivided into two groups: cases in which the negligence of each tort-feasor equally contributes to the final result, where also there is no basis or reason for indemnity; and, second, cases in which the negligence of one tort-feasor is primary or active, and that of the other is secondary or passive. It has been held that under such circumstances the latter is entitled to indemnity from the former.'
 
 
 [11]
 This circuit, differentiating between indemnity and contribution in cases between persons liable for a wrong, has said that in indemnity the law implies an agreement or obligation and enforces a duty on the primary or principal wrongdoer to respond for all the damages whereas in contribution there is no agreement, express or implied, but a common burden in which the parties stand in equali juri and which in equity and good conscience should be equally borne. George's Radio v. Capital Transit Co., 75 U.S.App.D.C. 187, 126 F.2d 219 (1942)
 
 
 [12]
 Joint Appendix, p. 116
 
 
 [13]
 The purpose of the bent leg cast was explained by a physician as follows:
 'The muscles which go from the foot and ankle up to the knee and hook on to the big bone above the knee * * * are very strong and they try to pull that bone out of place. To try to counteract that, we bent the knee * * * to relax the strong muscles in the back of the leg.' Joint Appendix, p. 120.
 
 
 [14]
 There was medical evidence that plaintiff's weight gain in inactivity and her shifting of weight to her right leg to ease the pain in her injured left leg created a problem with her right leg, accelerating arthritis and accounting for swelling of her right ankle and knee
 
 
 [15]
 It was explained by plaintiff's physician that the nerves which supply the forehead go up and over the forehead on each side, that the cut across the plaintiff's forehead severed both of these nerves, resulting in the numbness of which plaintiff complained