**Raymond WASHINGTON, Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, Defendant.**

Civ. A. No. 78–1046.

United States District Court, District of Columbia.

Sept. 20, 1979.

Jack H. Olender, Washington, D. C., for plaintiff.

Victor D. Ryerson, National Railroad Passenger Corp., Washington, D. C., T. Page Sharp, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

Plaintiff Raymond Washington brought this action under the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq.* (1976) to recover for injuries suffered while riding in a truck in the course of his duties as a commissary clerk for Amtrak. Amtrak conceded its liability for any injuries proximately caused by the accident. The three-day trial related solely to the amount of damages. Plaintiff adduced evidence that at the time of the accident, he was earning an annual rate of up to $30,000 (including overtime) and that the accident totally disabled him. Defendant adduced evidence that the plaintiff was not totally disabled, exaggerated his injuries during medical examinations, was a malingerer, and, at a minimum, was capable of sedentary but gainful employment. The jury heard the evidence, arguments of counsel, the Court's instructions, and deliberated for about two hours before rendering a verdict for the plaintiff for $378,890.39. On August 9, judgment was entered on the verdict in that amount.[1]

On August 16, defendants moved the Court to remit the judgment or, in the alternative, to grant a new trial, asserting that the verdict was contrary to the weight of the evidence and that the damages were excessive. Plaintiff opposed the motion. For the reasons set forth below, the Court denies defendant's motion and will permit the judgment to stand.

The standard for the grant of a remittitur or for a new trial in this jurisdiction was set forth in *Taylor v. Washington Terminal Co.*, 133 U.S.App.D.C. 110, 114, 409 F.2d 145, 149, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969):

---

1. A twelve-person jury might have deliberated longer and reached a different verdict.

In this jurisdiction particularly, District Court judges have given great weight to jury verdicts. They have stated that a new trial motion will not be granted unless the "verdict is so unreasonably high as to result in a miscarriage of justice," or, most recently, unless the verdict is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate."

133 U.S.App.D.C. at 149, 409 F.2d at 148–49, *quoting Frank v. Atlantic Greyhound Corp.*, 172 F.Supp. 190, 191 (D.D.C.1959) *and Graling v. Reilly*, 214 F.Supp. 234, 235 (D.D.C.1963) respectively. It has been the custom in this District for judges reviewing both denials of new trials and grants of remittiturs to perform general calculations based on the evidence to determine whether the verdict as rendered was "in the ballpark." *See, e. g., Williams v. Steuart Motor Co.*, 161 U.S.App.D.C. 155, 167, 494 F.2d 1074, 1086 (testing denial of remittitur).

Defendant claims both that the verdict is not supported by the weight of the evidence and that the amount of money damages awarded is grossly excessive. These two claims are in fact subspecies of the same assertion that the jury's verdict is not supportable by the evidence. *See Taylor v. Washington Terminal Co.*, 133 U.S.App.D.C. at 113 n.13, 409 F.2d at 148 n.13. A review of the evidence adduced by both parties demonstrates that the defendant's claim cannot be supported.

Dr. James Braden, plaintiff's treating physician who was recognized without objection as an expert in surgery, testified that the plaintiff could not perform the hard physical work that had been his task for a lifetime. Only one of the four medical experts who testified for the defendant, Dr. Charles H. Epps, expressed an opinion that Mr. Washington now suffers from no disability. Dr. Harold Stevens, who like Dr. Epps could find no objective sign of injury to the plaintiff, nonetheless testified that the plaintiff was qualified to do only light work.

Further, defendant's medical experts, Dr. Epps and Dr. Stanislaw K. Toczek, and plaintiff's medical experts, Dr. Braden and Dr. Quraishi, all testified that Mr. Washington suffered from a degenerative arthritic condition of the back that could cause pain and impair mobility. Dr. Toczek testified that an injury may precipitate pain from a preexisting arthritic condition; Dr. Epps testified that a preexisting arthritic condition may increase a person's susceptibility to injury.

Daniel B. Mauchline, who was qualified without objection as an expert in vocational rehabilitation, testified that if plaintiff could no longer perform heavy manual labor, he was "for all practical purposes" unemployable. Mr. Mauchline testified that he "could not conceive of any job in competitive industry" that the plaintiff could fill. The defendants offered evidence of jobs available to Mr. Washington that did not involve heavy labor. Dr. Daniel Sinick, defendant's vocational expert, who did not examine Mr. Washington, suggested that plaintiff could perform the tasks of a security guard or a parking lot attendant. Mark Meanier, Assistant Manager for Onboard Services for Amtrak, testified that Mr. Washington had sufficient seniority to obtain a position as an inventory accounting clerk, which would involve transferring figures from one form to another, or as an usher/gateman, which would entail reading train stops, answering passengers' questions, posting signs, and opening and closing the gate to the train platform. However, plaintiff adduced opinion evidence that plaintiff's limited (or non-existent) skills and physical disability made him unsuitable for such employment. The verdict is consistent with and is supported by evidence adduced by the plaintiff, and reflects a jury decision to reject or at least discount that advanced by the defendant with respect to plaintiff's job opportunities subsequent to his injury.

The claim of pain and suffering was supported by admissible evidence adduced by both parties. Mr. Washington did not testify on his own behalf. He was, however, called as a witness by defendant. He testi-

fied on cross-examination, in response to questions by his own counsel, that he continued to take medication for pain from the injury, and suffered from pain in his neck, shoulder blades, back and left leg. Although the questioning by the plaintiff's own counsel arguably exceeded the scope of defendant's direct examination, the defendant offered no objection and the plaintiff's testimony was received in evidence. Additionally, the reports of the treating and diagnosing physicians, which were also received in evidence without objection, reported extensive complaints by Mr. Washington that he suffered from constant pain and discomfort. Such statements were properly before the jury as admissible hearsay. See Rule 803(4), Fed.R.Evid. Defendant's efforts to discredit plaintiff's manifestations of pain as exaggerated or even malingering were apparently discounted by the jury.

Given the substantial body of evidence from which the jury might have inferred that defendant had caused him pain and suffering, and the opportunity afforded defendant to overcome it, the testimony of Mr. Washington's wife and son about the behavior of the plaintiff after the injury—which was not objected to by defendant at trial—was harmlessly cumulative, assuming *arguendo* that it was not competent evidence on the issue of plaintiff's pain and suffering.

Finally, the jury might have found both disability and pain and suffering from observing Mr. Washington's apparent difficulty and discomfort when defendant called him as a witness. When asked to take the stand, Mr. Washington stood with obvious difficulty and awkwardly climbed in and out of the witness chair, stumbling and appearing to fall. The jury could have discounted the performance as theatrics; or the jury could have observed his difficulties as graphic and demonstrative evidence of his disability and pain and suffering. The jury apparently decided on graphic evidence offered by defendant (the plaintiff hobbling to the witness stand) that the plaintiff was seriously disabled and had incurred injuries causing compensable pain and suffering.

Defendants claim that whatever may have been the effect of the plaintiff's appearance on the jury, the "damage had been done" by errors committed prior to his appearance as defendant's witness. Specifically the defendants point to the cross-examination of their vocational expert, Dr. Daniel Sinick. At the outset of the cross-examination, plaintiff's counsel asked permission for Mr. Washington to walk up to the witness in full view of the jury. Before the Court could react, the plaintiff stood and took a tentative step toward the witness stand. Before he could take another step, the Court excused the jury. See Transcript attached as Appendix I. The Court finds that the impact on the jury of plaintiff's half step was cured by distraction of the jury's attention and thereafter rendered completely harmless by Mr. Washington's display when called by the defendant.

The defendant also complains that the jury received improper demonstrative evidence of Mr. Washington's disability as a result of the Court's acquiescence in the plaintiff's request that Mr. Washington sit in the front row of the spectators' section (in full view of the jury) rather than behind the counsel table. The Court notes that counsel for the defendant offered no objection to this move when plaintiff's counsel represented that Mr. Washington would be more comfortable if he were seated on the wooden spectators' bench. Again, the jury observing Mr. Washington there could have concluded either that he was injured or that he was malingering. It apparently was persuaded of the former.

On the question of the amount of damages, the jury had before it in evidence the plaintiff's annual pay in 1976 of $26,000, including overtime, and his projected annual pay in 1977 (based on two full months before his injury) of $30,000 (also including overtime). The jury also heard the testimony of Mr. Mauchline, who was also qualified as an expert in prevailing industrial wage rates, that the plaintiff could expect to receive annual wage increases of approximately 10%. In addition, plaintiffs offered

the uncontroverted testimony of Louis J. Early, a member of the protective council of plaintiff's union, that Mr. Washington's normal retirement age was 70, so that his potential wage loss on account of total disability between date of the injury and his normal retirement date, unadjusted for inflation, was $390,000, or more than the amount of the entire verdict.

There was also in evidence a table of rates for discounting future income to present value (Defendant's Exhibit BB). This was a table for each of several rates ranging from one to fifteen. Although neither party submitted any evidence of a particular rate of discount which the jury should employ, rates were in evidence in the table for selection by the jury as to what the plaintiff could reasonably expect to receive on an investment. Similarly, although Mr. Washington's gross annual salary for 1974 through 1976 and his gross salary for the first two months of 1977 were in evidence, the jury had no evidence of the income tax rates for a person in plaintiff's circumstances.

The Court instructed the jury that if they found that plaintiff would suffer future lost income, the amount should be discounted to present value:

> If the jury should find that the evidence in the case establishes either: (1) a reasonable likelihood of future medical expense, or (2) a reasonable likelihood of loss of future earnings, then it becomes the duty of the jury to ascertain the present worth in dollars of such future damage, since the award of future damages necessarily requires that payment be made now for a loss that will not actually be sustained until some future date.
>
> Under these circumstances, the result is that the plaintiff will in effect be reimbursed in advance of the loss, and so will have the use of money which he would

not have received until some future date, but for the verdict.

In order to make a reasonable adjustment for the present use, interest free, of money representing a lump-sum payment of anticipated loss, the law requires that the jury discount, or reduce to its present worth, the amount of the anticipated future loss, by taking (1) the interest rate or return which the plaintiff could reasonably be expected to receive on the investment of the lump-sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then reduce, or in effect, deduct from the total amount of anticipated future loss, whatever the amount would be reasonably certain to earn or return if invested at such rate of interest over such future period of time; and include in the verdict an amount for only the present-worth—the reduced amount—of the total anticipated future loss.

The Court further instructed the jury that if it found the plaintiff entitled to a sum for future lost wages, the total should be reduced by the amount the plaintiff would pay in income tax:

> If your verdict is in favor of plaintiff, you should calculate his loss of earnings on the basis of his net earnings, i. e., the earnings left to him after the payment of income tax because he will not have to pay income tax on your award.[2]

The Court notes that during 1975 and 1976 plaintiff earned, through overtime, approximately 200% of his base hourly wage. Using his stipulated hourly rate in 1977 of $6.1238 per hour, and projecting hourly wage increases of 10%, based on Mr. Mauchline's testimony, the plaintiff would lose gross wages of $586,824 by the time he reached age 70. Applying a discount rate of 7%, the jury could have projected annual

---

2. Because no official transcript has been prepared, the jury instructions, as quoted, were taken from the defendant's proposed jury instructions as agreed to by the plaintiff. The court reporter, Ms. Lois LaCorte, has verified the quoted sections by reference to her notes of the official proceedings.

lost wages as follows, with the right hand column showing lost wages after 1979 reduced to their present value:

| | GROSS | PRESENT VALUE |
|---|---|---|
| 1977: | $21,228 [3] | – |
| 1978: | 28,021 | – |
| 1979: | 30,823 | – |
| 1980: | 33,905 | $31,701 |
| 1981: | 37,296 | 32,559 |
| 1982: | 41,026 | 33,477. |
| 1983: | 45,128 | 34,433 |
| 1984: | 49,641 | 35,394 |
| 1985: | 54,605 | 36,367 |
| 1986: | 60,066 | 37,421 |
| 1987: | 66,023 | 38,425 |
| 1988: | 72,680 | 39,538 |
| 1989: | 79,948 | 40,614 |

The total value of past lost wages and the present value of future lost wages is $440,-001. Plaintiff's Pretrial Statement, filed November 24, 1978, indicated that plaintiff's net income was approximately 65% of his gross income. Using this figure, plaintiff's net lost wages would be $286,001. Were the jury to have reached a similar figure, it would mean that $92,889 of its award presumably was apportioned as compensation for plaintiff's pain and suffering, which was amply supported by evidence at trial. See pages 1135–1136, supra.

The Court cannot, of course, ascertain that the jury's calculations were those employed herein by the Court. However, the Court's calculations do establish a range of reasonableness within which the jury's verdict plainly falls. This manner of calculation was employed by the Court of Appeals in Williams v. Steuart Motor Co., 161 U.S. App.D.C. at 167, 494 F.2d at 1086, to establish that the verdict reached by the jury was not excessive.

Considering the nature of the plaintiff's injury, his impressive history as a wage-earner, that the jury could well have found that his disability was total, and that plaintiff claimed to suffer from constant and pervasive pain as a result of his injuries, the Court finds the verdict not to be excessive.

This verdict may seem excessive because plaintiff worked essentially as a laborer. This first impression overlooks the uncontroverted evidence that he earned from base wages and an enormous amount of overtime an annual salary ranging up to $30,000 per year. This fact, not any quirk of the jury system, is the most likely explanation of the large verdict.

In reaching its conclusion, the Court has considered the fact that neither party offered evidence as to what Mr. Washington could have earned on the lump sum which the jury determined to be his legitimate expectation, had he not been disabled. The jury was thus left to select that rate on the basis of its own experience. If either party had made any issue of this, the Court's failure to require proof of rate might require a new trial. But the instruction quoted above was proposed by the defendant and concurred in by plaintiff. Neither made any issue about the absence of any evidence of the rate and none has been raised by the pending motion. The result reached by the jury is consistent with that which would be obtained by applying a rate that is not unreasonable (seven percent). The subject is not one so vital to due process that the Court should have addressed it sua sponte.

Accordingly, it is, this 20th day of September, 1979, hereby

ORDERED: That the defendant's motion for remittitur, or, in the alternative, for a new trial, is DENIED in all respects.

Appendix to follow

---

3. This amount is for the last ten months of 1977; plaintiff was injured on March 7, 1977, and was paid in full up to that date.

APPENDIX I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAYMOND WASHINGTON,  )
                     )
        Plaintiff;   )
                     )    Civil Action
    v.               )    No. 78–1046 :
                     )
NATIONAL RAILROAD    )
PASSENGER CORPORATION, )
                     )
        Defendant.   )

Washington, D. C.

Wednesday, August 8, 1979

EXCERPT OF REPORT OF PROCEEDINGS had in the above-entitled cause before THE HONORABLE LOUIS OBERDORFER, United States District Judge, commencing at 9:30 a. m.

(Jury present.)

MR. SHARP: No further questions. Thank you very much.

THE COURT: Mr. Olender.

MR. OLENDER: Your Honor, with the Court's permission, I would like Mr. Washington to walk up to see the witness, Dr. Sinick.

THE COURT: We will excuse the jury. We will excuse the jury.

MR. OLENDER: Very well.

(Jury excused.)

THE COURT: Before I do that, I want to say something. You chose not to call this witness, this defendant as a witness.

MR. OLENDER: The plaintiff.

THE COURT: Plaintiff. I'm not going to allow you to get the benefit of his testimony or his appearance in the circumstances and I'll hear counsel before I charge the jury on what comments plaintiff may make in this civil case on account of his failure to take the stand. You may, if you want him to now, have him walk up toward the witness stand. You may do that.

MR. SHARP: I think we would object.

THE COURT: You have an item for appeal. Go ahead.

(The plaintiff, Mr. Washington, walked to the witness stand.)

MR. OLENDER: I would like Mr. Washington to hold his hands out to Dr. Sinick, and if Dr. Sinick wants to ask him any questions that would help him in his evaluation, I would like him to.

THE COURT: I'm not going to take the time of the courtroom for physical examination. You have the advantage of a witness who hasn't physically examined the plaintiff. This is not the place for a physical examination.

You may return to your seat, Mr. Washington.

\*       \*       \*       \*       \*       \*

CERTIFICATE OF REPORTER

I hereby certify that the foregoing two pages constitute an excerpt of the official transcript of proceedings had in the above-entitled cause.

Lois A. LaCorte
Official Reporter