Lee DRESBACH, Plaintiff,

v.

DOUBLEDAY & COMPANY, INC., et al., Defendants.

Civ.A. No. 81–0082.

United States District Court,
District of Columbia.

July 31, 1981.

Jacob A. Stein, Michael A. Schuchat, Washington, D.C., for plaintiff.

Robert M. Callagy, New York City, for defendant Doubleday.

Fred. H. Harrison, Little Rock, Ark., for defendant Mewshaw.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

This is a diversity action for invasion of privacy and libel concerning the book *Life For Death*, (the Book) written by defendant Michael Mewshaw and published by defendant Doubleday & Company. The Book concerns the 1961 murders of the parents of plaintiff Lee Dresbach by his brother

Wayne Dresbach. At the time, plaintiff was fourteen and his brother was fifteen years old. Defendant Mewshaw, a slightly older peer of the plaintiff's, was a summertime neighbor and personal acquaintance of the Dresbachs before the murders. After the murders, defendant's parents became intensely involved with both Wayne and Lee Dresbach. They frequently visited Wayne in prison, (sometimes accompanied by the author), and were active in arranging for the appeal of his conviction. Lee lived in their home for about three years. During some of this period, the plaintiff was dating defendant's sister. Therefore, much of the Book, which defendant describes as "significantly autobiographical", is based upon personal experience. Plaintiff claims that the Book exposes private information about him which is offensive and objectionable to reasonable persons of ordinary sensibilities. He avers that he has always endeavored to conduct himself as a private person, and that the events described in the Book received no public attention during most of the intervening period between 1961 and the publication of the Book in 1980.

The libel claim is based upon plaintiff's characterization of the Book as identifying him as a co-conspirator and accessory before and after the fact in the murder of his parents; he asserts that several misstatements of fact in the Book have the effect of accusing him of the murder of his parents. Plaintiff alleges that those statements were either known by the defendants to be untrue or made with a reckless disregard for the truth.

Both defendants have moved for summary judgment on both counts.

*Invasion of Privacy*

Invasion of privacy was not an early common law action, but was adopted in various forms by courts and legislatures beginning in the early twentieth century on the inspiration of a law review article by Samuel D. Warren and (later to be Justice) Louis D. Brandeis, *The Right to Privacy*, 4 Harvard L.Rev. 193 (1890). The cause of action described in the article was based on the right

"to be let alone", free from the unauthorized publication of matters concerning one's private life, habits, acts, and relations. The injury to be redressed was to the feelings and sensibilities of the person, (rather than to his reputation in the community as in a defamation action), and the truth or falsehood of the publication was irrelevant, as was the ill will or culpability of the author. However, the right of privacy described in the article did not prohibit publication of matter of public or general interest.

The denomination "invasion of privacy" has since been applied to the unauthorized appropriation of one's name or likeness, (as in advertising), unreasonable invasion into one's seclusion, (such as a "peeping Tom" or electronic surveillance), and to publicity which unreasonably places one in a false light before the public. Restatement of Torts (2d) § 652A. Plaintiff appears to be alleging both the type of invasion originally discussed by Brandeis and Warren, that is, unreasonable publicity to one's private life, and "false light" publicity.

■ The tort of invasion of privacy is recognized in the District of Columbia. *Bernstein v. National Broadcasting Co.*, 129 F.Supp. 817 (D.D.C.1955), *aff'd*, 232 F.2d 369 (D.C.Cir.1956), *cert. denied*, 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956); *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649 (D.C.Cir.1966). To prevail upon a claim for unreasonable publicity to one's private life, the plaintiff must show publication of private facts in which the public has no legitimate concern, whose publication would cause suffering, shame, or humiliation to a person of ordinary sensibilities. This jurisdiction follows Warren and Brandeis' suggested exclusion of matters of legitimate public or general interest from the scope of the unreasonable publicity tort. *Elmhurst v. Pearson*, 153 F.2d 467 (D.C.Cir. 1946); *Pearson v. Dodd*, 410 F.2d 701 (D.C. Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). However, one may prevail in a false light invasion of privacy action even where the subject matter is of general or public interest. *Cantrell v. Forest City Publishing Co.*, 419 U.S. 245,

95 S.Ct. 465, 42 L.Ed.2d 419 (1974). (Upholds plaintiffs' verdict on false light theory without disturbing Court of Appeals' finding, *Cantrell v. Forest City Publishing*, 484 F.2d 150 (6th Cir. 1973), that the subject matter was of legitimate public interest). *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). (False reports of matters of public interest may be redressed, if actual malice standard met). *Logan v. District of Columbia*, 447 F.Supp. 1328 (D.D.C.1978).

■ The Supreme Court has clearly held that in order to adequately accommodate First Amendment values in defamation actions, the publication must be shown to be false, and published either with knowledge of its falsity or reckless disregard for its truth or falsity, (actual malice), in the case of a public official or public figure; or with some degree of fault in the case of private individuals. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court has also applied the actual malice standard to a false light case. *Time, Inc. v. Hill, supra.* However, the Court later characterized as an open question whether the actual malice standard need apply to all false light cases, citing *Gertz v. Robert Welch, supra. Cantrell v. Forest City Publishing Co., supra. Time Inc. v. Hill* was decided before *Gertz*, which held that the actual malice standard was not constitutionally required in defamation actions involving private persons, even though the subject matter of the publication could be considered newsworthy. Although the Supreme Court has had no occasion to decide the matter, no reason appears to distinguish false light invasion of privacy actions from defamation actions in this regard. Since the District of Columbia applies a negligence standard to defamation actions involving private individuals, *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78 (D.C.App.1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981), that standard should also be applied to a false light action.

Despite the Supreme Court's requirement that not just falsity, but negligent, reckless or intentional falsity, be a defense to a defamation action, the Court has not ruled out a cause of action based upon true statements constituting an unwarranted invasion of privacy. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 487–491, 95 S.Ct. 1029, 1042–1044, 43 L.Ed.2d 328 (1975); *Time, Inc. v. Hill, supra* at 382–384 and n. 7, 87 S.Ct. at 539–540 and n.7; *Garrison v. Louisiana*, 379 U.S. 64, 70–75 and n. 9, 85 S.Ct. 209, 213–216 and n.9, 13 L.Ed.2d 125 (1964). In order to protect First Amendment values regarding such statements (which would seem more deserving of protection than the false statements which are the subject of defamation actions), the lower courts have given broad latitude to the exception applied to publications which although possibly revealing private information offensive to the ordinary person, are of public or general interest. *E. g. Sidis v. F–R Publishing Corp.*, 113 F.2d 806, 809–810 (2d Cir.), *cert. denied*, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940) (cited in *Garrison v. Louisiana, supra* at n. 9); *Campbell v. Seabury Press*, 614 F.2d 395 (5th Cir. 1980); *Elmhurst v. Pearson, supra.* In fact it has been suggested that the exception has swallowed the rule. Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?* 31 Law & Contemporary Problems 326, 335–336 (1966); *Time, Inc. v. Hill, supra*, at n. 7 and cases cited therein.

In our case, plaintiff asserts that there was no public interest in the subject matter of the Book at the time of its publication in 1980, as opposed to the time of the events described, and that the issues of public interest claimed by defendants to be explored in the Book, such as child abuse, violent youth, and the functioning of the criminal justice system, have nothing to do with plaintiff, and do not justify publication of private facts about him. Facts which plaintiff believes cast him in a bad light and are unnecessary to the stated purposes of the Book include the limited number of visits he made to his brother in jail, his "abandonment" of his brother, his failure to render financial assistance to his brother, the fact

that he did not share his inheritance from his parents with his brother, and his concealment of his whereabouts from him. In addition, plaintiff objects generally to the inclusion of private facts about his childhood and his life after the murders, as well as to his appearance as a "central character" in the Book.[1]

While plaintiff disputes the accuracy of some of these disclosures, the truth of some, such as the fact that he did not share his inheritance with his brother, is undenied. (Plaintiff's Deposition at 83–84.) The cause of action as to true statements will be discussed first, followed by the false light aspect of the claim.

In support of the argument that the passage of time has rendered private subject matter which was admittedly at one time a legitimate subject of public interest, plaintiff cites cases holding that a cause of action may be stated where a publication identifies a rehabilitated criminal with his crime of many years past. *Melvin v. Reid*, 112 Cal.App. 285, 297 P. 91 (1931); *Bernstein v. National Broadcasting Co., supra; Briscoe v. Readers Digest Association*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (1971). *Melvin v. Reid* involved a movie about a woman who eight years previous had been a prostitute and was tried for murder and acquitted. She had since reformed and become a respectable member of society. Many of her present acquaintances did not know of her past. The Court found that although the republication of events in the public record was not actionable, a cause of action for invasion of privacy was stated based upon the use of plaintiff's correct maiden name in connection with unsavory incidents of her past life. A major reason for allowing such an action, in the eyes of the Court, was society's interest in the "rehabilitation of the fallen and the reformation of the criminal." *Melvin v. Reid, supra*, 297 P. at 93. In *Bernstein*, while finding no privacy cause of action on the facts of that case, the Court stated that

there could be a cause of action for unreasonable public identification of a person in his present setting referring to earlier actions which took place at a time when the plaintiff was a legitimate object of public interest. *Briscoe* held that the plaintiff has a cause of action for a publication concerning his involvement in a truck hijacking incident eleven years earlier. Plaintiff alleged that he had been completely rehabilitated since, and that he had many friends, as well as a daughter, who were not previously aware of his involvement in that offense. The Court stated that truthful reports about recent crimes are privileged, as are the facts about past crimes. However, identification of the actors in long past crimes, where the actors had done nothing to reattract public attention, could be found by a jury to be without legitimate public interest and grossly offensive to the average person. The Court believed that a jury could find that the article in question concerning truck hijacking would have lost none of its value by deleting the plaintiff's name. An important factor in the decision was the State's interest in the rehabilitative process.

The State interest in the rehabilitative process was characterized as "most important" in the *Briscoe* case in a recent California Supreme Court case, *Forsher v. Bugliosi*, 26 Cal.3d 792, 163 Cal.Rptr. 628, 608 P.2d 716 (1980), stating that *Briscoe* was "an exception to the more general rule that 'once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days." *Forsher*, 163 Cal.Rptr. at 638, 608 P.2d at 726, quoting Prosser, *Privacy*, 48 Cal.L.Rev. 383, 418 (1960).

In our case we must decide whether true matters in the Book were matters of public interest at the time they were published, and whether the inclusion of plaintiff in connection with those matters was legitimate, or whether the countervailing inter-

---

1. It appears from plaintiff's deposition testimony that some of the material in the Book which he considers to be the most objectionable concerns his parents. E. g. Plaintiff's Deposition at 134–135, 137, 138–139. Of course, plaintiff has no standing to object to material which does not refer to him, whether based upon invasion of privacy or upon defamation.

est in plaintiff's privacy concerning those matters many years after the events renders the publication actionable.

■■ Given the generally broad public interest exception to the right of privacy action, and the fact that the few cases plaintiff has been able to cite in his favor rest strongly upon the plaintiffs' status as rehabilitated criminals, there is no doubt that for the purpose of a privacy action, the subject matter of this Book was of legitimate public interest at the time it was published. (We need not decide whether Wayne Dresbach, as a rehabilitated criminal, could have brought a privacy action concerning this Book, as he has given his consent to its publication). The public has a legitimate interest in the facts about past crimes and their investigation and prosecution, as well as the possible motivating forces in the background of the criminal. Plaintiff cannot prevail on a theory that the subject matter of the Book had become private with the passage of time. He also cannot object to republication of matters which are in the public record of the trial and related proceedings, no matter how private or offensive, as information in the public record is absolutely privileged. *Cox Broadcasting Corp. v. Cohn, supra; Harrison v. Washington Post Co.*, 391 A.2d 781 (D.C.App.1978). Nor could the Book have been written, with its implication that the circumstances of Wayne's home life drove him to murder, without including private facts about plaintiff's home life, which obviously was intimately bound up with his brother's. This is even more true here than in the usual case of brothers growing up in the same home, since much of the friction between Wayne and his parents concerned their unfavorable comparison of him with Lee. (This is supported by plaintiff's deposition testimony, at 154).

Plaintiff's relationship with his brother after the murders and plaintiff's own subsequent history are less obviously integral to the subject matter of the Book. However, we tread on dangerous ground deciding exactly what matters are sufficiently relevant to a subject of legitimate public interest to be privileged. First Amendment values could obviously be threatened by the uncertainty such decisions could create for writers and publishers. "Only in cases of flagrant breach of privacy which has not been waived or obvious exploitation of public curiosity where no legitimate public interest exists should a court substitute its judgment for that of the publisher." *Cantrell v. Forest City Publishing Co.*, 484 F.2d 150 (6th Cir. 1973), *rev'd on other grounds*, 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). This is not such a case. The subject matter of Wayne's rehabilitation after his murder conviction, focusing both on prison conditions and the support or lack thereof he received from friends and family, cannot be said to be without legitimate public interest, and facts about Wayne's relationship with his brother are clearly related to that subject. In *Campbell v. Seabury Press*, 614 F.2d 395 (5th Cir. 1980), the plaintiff was found not to have a cause of action for invasion of privacy for the disclosure of private facts regarding her marriage and home life. The book in question was the autobiography of a man whose brother, plaintiff's former husband, was a religious and civil rights leader. The challenged disclosures were included in the context of plaintiff's relationship with the brother and the impact of that relationship upon the author. The Court held that there is a constitutional privilege to publish news or other matters of public interest, and that the privilege "extends to information concerning interesting phases of human activity and embraces all issues about which information is needed or appropriate so that individuals may cope with the exigencies of their period.... [The privilege applies even to] information relating to individuals who have not sought or have attempted to avoid publicity .... The privacy of such individuals is protected, however, by requiring that a logical nexus exist between the complaining individual and the matter of legitimate public interest." *Id.* at 397. The Court found that the accounts of the brother's marriage as they impacted upon the author had the requisite logical nexus to fall within the ambit of constitutional pro-

tection. Although this Court might not go as far as the *Campbell* court in extinguishing the right to privacy, clearly here, where the important public issues of crime, the criminal justice system, and rehabilitation are concerned, the defendants have shown an adequate nexus between matters of legitimate public interest and the disclosures about the plaintiff to merit constitutional protection.

We are not without compassion for Lee Dresbach's plight. The exercise of defendants' First Amendment rights has imposed a heavy burden upon plaintiff. It is easy to sympathize with his objection to the Book having been written at all, and certainly to his inclusion in it. In his own words in response to the question, "What else do you find objectionable?", he replied, "Me being in the book at all. I asked not to be in the book. I have a right to my own privacy. I can go probably weeks without thinking about seeing two people murdered. Every day since then all I do is think about it." Plaintiff's Deposition at 138. Additionally, a great deal of very sensitive information about plaintiff's past which he has chosen to keep secret is now available to friends, employers, customers, his wife, and in-laws. Yet, there is no doubt that a cause of action based upon truthful material in the Book cannot be permitted consistent with the First Amendment. Clearly, this society has put a higher value on open criminal proceedings and on public discussion of all issues than on the individual's right to privacy. To guard against the possible evils of abuse of power if the criminal justice system were to operate away from the public eye, and of suppression of freedom of thought if writers could not freely explore the causes and handling of past crimes of public interest, the plaintiff's right to bury the past must be sacrificed. Freedom of speech would be crippled if discussions of matters of public interest were narrowly circumscribed in the manner suggested by

plaintiff to protect privacy. Summary judgment must be granted in favor of both defendants on plaintiff's privacy claim as to accurate material in the Book.

■ A cause of action may be stated for a false light invasion of privacy even where the subject matter is of legitimate public interest. See p. 1287, *supra*. Insofar as plaintiff can point to specific passages of the Book which are alleged to be inaccurate, placing him in a false light before the public, which are an offensive invasion of his privacy, and which were written without the exercise of ordinary care to determine their accuracy, a jury issue is created. However, plaintiff has not clearly delineated in his pleadings what portions of the Book he claims meet these requirements. In his deposition testimony, he appears to concede the substantial accuracy of the statements concerning his inheritance, the frequency of his visits to his brother in prison, and his failure to inform his brother of his whereabouts. He does deny the accuracy of some of the incidents described in the Book, such as that regarding Wayne's efforts to borrow money from him to fix his teeth, Deposition at 142–43, and that concerning the will plaintiff made before leaving for Viet Nam, in which according to the Book, he left his brother $5.00. Deposition at 182–83. He also denied generally that he was abused by his parents as described in the Book, Deposition at 126, 130, and states to the contrary that his father treated him kindly. Deposition at 153. In his affidavit in support of his Opposition to Defendants' Motion for Summary Judgment, plaintiff generally denies that he abandoned his brother and concealed himself from him. Plaintiff's notebook, submitted in excerpted form by defendants as Exhibit E to the Motion for Summary Judgment, also contains some statements disputing the accuracy of certain portions of the Book.[2] It is nevertheless impossible to determine from

---

2. Although plaintiff stated in his deposition testimony (at 97) that his notebook was where he set out what he considered to be false in the Book, and repeatedly asked to refer to his notebook when asked specific questions regarding

his claims, Deposition at 114–115, 137, 139, he has not produced the notebook or any part of it, to substantiate his opposition to Defendants' motions for summary judgment.

any of these materials which statements plaintiff is relying upon for his false light claim, and in some instances, which passages in the Book he is referring to. In order to withstand the motion for summary judgment, plaintiff must make a further submission to the Court delineating precisely which passages in the Book are alleged to invade plaintiff's privacy and place him in a false light, including the manner in which they are claimed to be inaccurate.

■■■■ As plaintiff is not a public figure (see discussion concerning libel below), a negligence standard applies to the accuracy of the statements in his false light claim. See pp. 1288–1289, *supra.* Since both defendants have asserted in their moving papers, supported by affidavits, that all due care was exercised in the writing and publication of the Book to insure its accuracy, plaintiff must establish that there is a genuine dispute of material fact as to whether there was negligence in order to avoid summary judgment. Other than an unsupported assertion in his complaint, plaintiff has made absolutely no showing of negligence on the part of defendant Doubleday. In his deposition, he states that he does not know whether Doubleday suspected anything in the Book was false. Clearly, a publisher is not required to do independent research to verify everything written by a reputable author. Unless there was some circumstance to raise suspicions, Doubleday, pursuing its own careful examination, was entitled to rely upon the efforts of defendant Mewshaw, who, according to his uncontroverted affidavit, obtained his information from interviews with Wayne Dresbach and other persons with knowledge of the events related in the Book, the transcript of the trial and other public records such as statements made by Wayne and Lee Dresbach to investigating officers, psychiatric reports and evaluations prepared for use at the trial, the equity file of the guardianship of Lee and Wayne Dresbach, and newspaper accounts of the events and the trial, as well as from his personal experience. Mewshaw Affidavit at ¶ 7. In addition to its reliance upon the efforts of the author, defendant Doubleday, according to the affidavit of its attorney, independently substantiated all potentially libelous matters, completely reviewed the author's sources, conducted interviews, had extensive discussions with the author, and completely verified all matters from public records. Callagy Affidavit at ¶ 16. Plaintiff, who has had ample opportunity to conduct discovery in this case, has not presented anything, nor does a review of the entire record of this case reveal anything, which could refute defendant Doubleday's claim that it exercised due care in insuring the accuracy of the Book. Accordingly, summary judgment will be entered for defendant Doubleday & Co., Inc. on the false light privacy claim.

■■■■ Defendant Michael Mewshaw had the primary responsibility for the accuracy of the Book. Although plaintiff's submissions are also weak in refuting defendant Mewshaw's claim that he exercised all possible due care in the writing of the Book, that defendant's first line of responsibility, combined with some material in the record which could be considered to create a material issue as to his negligence, mandates the denial of summary judgment in his favor on the false light claim. Plaintiff does controvert, based upon his own memory of the events, the accuracy of various incidents and statements related in the Book, and avers that defendant Mewshaw, either from his personal experience of the events, or by checking the records, knew or should have known that the material was inaccurate. Plaintiff also avers that defendant Mewshaw's personal hostility toward him motivated defendant to place plaintiff in a false light in the Book. Although personal ill will is not determinative of negligence, *Hotchner v. Castillo-Puche,* 551 F.2d 910, 914 (2d Cir.) *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977), it does contribute to the creation of an issue for trial, in that it is some evidence of possible negligence or disregard of the truth. While defendant denies that he bears plaintiff any ill will at this time, he does not deny, and in fact confirms in the Book, the claimed sources of his hostility toward the plaintiff, namely his jealousy over the amount of

attention his parents devoted to the plaintiff and his brother after the murders, and plaintiff's romantic relationship with the defendant's sister, both teenagers at the time.

▇ Accordingly, assuming that plaintiff can point to specific passages in the Book which can meet the requirements of a false light invasion of privacy action, as described above, that issue will remain for trial as against defendant Mewshaw only. Plaintiff may make both a false light claim and a libel claim regarding the same material, as the two actions require different elements of proof. While injury to reputation must be shown on the libel claim, to recover on a false light theory, plaintiff must show publication of private information which places him in a false light, which would be offensive to the ordinary person, and which publication has caused him mental suffering.

*Libel*

Plaintiff's libel claim suffers from the same deficiency as his false light claim: that he has not specified which passages in the Book he alleges to be false and defamatory. He makes the general claim that "A fair reading of the book portrays plaintiff as a co-conspirator or accessory with his brother, Wayne Dresbach in the commission of the crime for which Wayne Dresbach was tried and convicted." Complaint at 3, ¶ 18. More specifically, plaintiff alleges that six misstatements of fact so identify the plaintiff. They are: 1. That plaintiff knew of the intent of Wayne Dresbach to kill their parents prior to the murder. 2. That plaintiff told Wayne Dresbach to "shoot him again". 3. That plaintiff did not prevent the murder of his mother. 4. That plaintiff did not help Wayne Dresbach in jail. 5. That plaintiff received the inheritance from their parents and would not share any of the funds with Wayne Dresbach. 6. That plaintiff left the Washington, D.C. area without advising Wayne Dresbach of a forwarding address. The first statement does not appear in the Book, except insofar as it quotes where plaintiff

stated in public records that his brother told him of his intention to kill their parents, but that he did not believe it. The third and fourth statements are not specifically made in the Book, and plaintiff does not point to which false or misleading passages would create this impression. The fifth and sixth statements are confirmed as accurate in plaintiff's deposition testimony. The second statement is attributed in the Book to Wayne Dresbach. The Book does not purport to be fact that plaintiff said "Shoot him again", but rather that Wayne Dresbach said he said it. Wayne Dresbach has signed a statement verifying matters attributed to him in the Book. Therefore the statement in the Book cannot, strictly speaking, be said to be false. The Book does not neglect to include plaintiff's version of the events as contained in the public records (which is all the author had available to him since plaintiff refused to be interviewed by him for the Book), which contradicts this aspect of Wayne's version.

▇ Therefore none of the specific statements claimed to be in the Book stand up under analysis as viable bases for a libel claim as the record presents at this point. In plaintiff's Opposition to the Motion for Summary Judgment, rather than further particularizing the claim, Lee Dresbach relies upon the generalized "inference" created by a "fair reading of the book" that "plaintiff knew of the impending crime, did nothing to prevent it, desired it to take place, profited by it, abandoned his brother, failed to share the inheritance and concealed his whereabouts from his brother." Plaintiff's Opposition at 10. Plaintiff in his Affidavit denies that these inferences are true. The Court concludes from a reading of the Book that it cannot be said as a matter of law that these inferences cannot be drawn from the Book, or that some of them are not false and defamatory. Under the circumstances, though plaintiff has failed to make a proper showing in his pleadings, summary judgment will not be granted at this stage based upon the alleged lack of defamatory material in the Book. However, denial of summary judg-

ment will be predicated upon a proper showing by plaintiff of exactly which passages in the Book are false and defamatory and lead to the inferences claimed.

■ The determination of whether the negligence or the actual malice standard applies here, that is, whether plaintiff is a public or a private figure, is a question of law to be decided by the judge, and not the jury. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1293 n.12 (D.C. Cir.), *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). Assuming that plaintiff will be able to specify defamatory passages in the Book, the public figure determination must be made at this point in order to determine whether summary judgment is appropriate on the issue of fault. As alluded to regarding the false light claim, plaintiff is a private figure, to whom the negligence standard of liability applies.

■ The Supreme Court has defined "public figure" for the purpose of libel claims in *Gertz v. Robert Welch, Inc., supra.*

> Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such pervasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id.*, 418 U.S. at 345, 94 S.Ct. at 3009. Private individuals are entitled to a greater degree of protection from defamation than public figures, first because they usually have less access to the channels of effective communication to counteract false statements, and more importantly, because public officials and public figures have generally voluntarily exposed themselves to increased risk of injury from defamatory falsehoods by the positions they have assumed. *Gertz, supra*, 418 U.S. at 344–45, 94 S.Ct. at 3009–10.

■ The application of these principles in this Circuit has required the Court, in order to find that a plaintiff is a public figure for limited purposes, (it is not claimed that plaintiff here is a public figure for all purposes), to first isolate a public controversy which is a real dispute whose outcome affects the general public or some segment of it in an appreciable way, and which is actually being publicly discussed; and then determine whether the plaintiff has thrust himself into the forefront of that controversy so as to become a factor in its ultimate resolution. *Waldbaum v. Fairchild Publications, Inc., supra.* Defendants claim that the crime, prosecution and rehabilitation of Wayne Dresbach formed a part of the public controversy over child abuse, violent youth, rehabilitation, and the problems of the criminal justice system in general; and that plaintiff, as the only surviving witness of the killings, an important witness at Wayne's trial, and the innocent victim of a home life that drove his brother to murder their parents, is an involuntary public figure. If in fact this situation meets the first test set forth in *Waldbaum*, a public controversy, it still cannot be said that plaintiff thrust himself into the forefront of that controversy so as to become a factor in its ultimate resolution. A fourteen year old child at the time, he merely described what he witnessed when required to do so by police and the Court. He never took a position on any issue, and was not the object of controversy himself. At most, he was casually mentioned as Wayne's brother in some of the newspaper articles about the murders. His trial testimony was not determinative or controversial, since Wayne repeatedly confessed the murders himself. Referring to the rationales for the public/private distinction put forth in *Gertz*, plaintiff did not, by his involvement in the events described in the Book, gain any special access to the channels of communication to enable him to rebut falsehoods about him. And he certainly did not

voluntarily expose himself to the risk of defamatory falsehoods. "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention . . . . A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times.*" *Wolston v. Reader's Digest Association, Inc.,* 443 U.S. 157, 167–68, 99 S.Ct. 2701, 2708, 61 L.Ed.2d 450 (1979).

Defendants' comparison of this case with *Street v. National Broadcasting Co.,* 645 F.2d 1227 (6th Cir. 1981), is faulty. That case involved a televised play about the rape trial of the "Scottsboro boys", which was a subject of intense national attention when it took place 40 years ago. Plaintiff was a white woman who claimed to have been raped by nine black youths. Controversy raged around the truth of her accusation and the ability of our courts to render even-handed justice. The Court found that the trial was a contributing factor in changing public attitudes about the right of black citizens to equal treatment under law and in changing constitutional principles governing the right to counsel and the exclusion of blacks from the jury. Plaintiff, as the sole prosecutrix, was found to have played a major role in the public controversy. Although as an alleged rape victim, she did not voluntarily thrust herself into the controversy, (unless her story was fabricated, which the Court would not decide at that juncture), she gave press interviews and aggressively promoted her version of the case outside of the courtroom. Plaintiff was a public figure because she "played a major role, had effective access to the media and encouraged public interest in herself." *Id.,* 645 F.2d at 1235. The Court found that she remained a public figure for the purposes of that controversy even forty years later. A pivotal role in the trial and voluntary exposure to the media are totally absent in our case.

As plaintiff was not a public figure even at the time of the trial in 1961, there is no need to determine whether the passage of time changed his status.

As a private individual, plaintiff must prove negligence on the part of defendants in the publication of false defamatory statements. The ability of the plaintiff to withstand summary judgment on the negligence issue has already been discussed in connection with the false light claim. The reasoning and the dispositions are exactly the same for the libel claim. Summary judgment will be granted in favor of defendant Doubleday & Co., Inc., but denied with respect to defendant Mewshaw.

As plaintiff is now required to make a further submission in support of his false light and libel claims, which must be determined by the Court to be adequate to defeat defendant's summary judgment motion before the case can proceed to trial, the currently scheduled trial date of September 21, 1981, will be continued. Defendant Doubleday will be dismissed from the case entirely.