**Mary VASSILIADES, Appellant,**

v.

**GARFINCKEL'S, BROOKS BROTHERS, Miller & Rhoades, Inc., and Csaba Magassy, M.D., Appellees.**

**No. 83–1255.**

District of Columbia Court of Appeals.

Argued Oct. 10, 1984.

Decided May 13, 1985.

---

Charles S. Vizzini, Washington, D.C., for appellant.

James W. Greene, Washington, D.C., for appellee Garfinckel's.

Keith M. Bonner, Washington, D.C., for appellee Magassy.

Before PRYOR, Chief Judge, and NEWMAN and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellant, Mrs. Mary Vassiliades, sued her plastic surgeon, Csaba Magassy, M.D., and Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc. (Garfinckel's), for invasion of privacy on several theories because the doctor used "before" and "after" photographs of her cosmetic surgery at a Garfinckel's department store presentation and on a television program promoting the presentation. Dr. Magassy denied any liability on the grounds Mrs. Vassiliades consented to disclosure of her photographs and the publication was privileged as a matter of legitimate public interest. Garfinckel's asserted the First Amendment privilege and claimed the disclosure of Mrs. Vassiliades' photographs was made in good faith and without notice of lack of consent.

At the close of the plaintiff's case, the trial court granted defendants' motion for directed verdicts on the punitive damages claim and Dr. Magassy's motion for direct-

ed verdicts on the claims for breach of fiduciary duty and portrayal of Mrs. Vassiliades in a false light. At the close of all the evidence the defendants moved for directed verdicts on the remaining issues. The court reserved ruling on these motions and sent the case to the jury. The jury returned a verdict of $100,000 against Dr. Magassy for the television presentation and a verdict of $250,000 against Dr. Magassy and Garfinckel's jointly for the department store presentation. After a hearing, the trial court granted defendants' motions for judgment notwithstanding the verdicts and alternatively for a new trial, Super.Ct.Civ.R. 50(c), on the grounds that the verdict was against the weight of the evidence, contrary to the evidence, and excessive.

Upon review of the evidence, we hold Mrs. Vassiliades presented sufficient evidence for a jury reasonably to find her privacy was invaded by Dr. Magassy because of publicity of private facts and breach of fiduciary duty by a physician, but failed to present sufficient evidence of an invasion of privacy based on publicity placing her in a false light or appellees' appropriation of her likeness for commercial gain. We further hold that Garfinckel's cannot be held liable because it had obtained assurance from Dr. Magassy of Mrs. Vassiliades' consent to use her photograph. Therefore, we reverse the judgment notwithstanding the verdict as to Dr. Magassy for invasion of privacy based on publicity of private facts and the directed verdict for breach of fiduciary duty by a physician. In other respects we affirm the judgment below.

I

The evidence established that, in contemplation of undergoing plastic surgery, Mrs. Vassiliades, a secretary, housewife and mother, resigned from her secretarial position at the U.S. Department of Health and Human Services in 1977 at the age of 54, and thereafter assisted her husband in conducting his business. In April 1978, she contacted Dr. Magassy to discuss the possibility of having him perform the surgery; he performed the surgery successfully the next month. Before and after the surgical procedure, Dr. Magassy took photographs of Mrs. Vassiliades' face. Mrs. Vassiliades understood the photographs were being taken as part of the doctor's regular routine for use with other patients. Dr. Magassy testified he also took photographs as a protective measure in the event a patient later claimed there had been no improvement in appearance.

Several months after Mrs. Vassiliades' last postoperative visit, Dr. Magassy was invited by the director of public relations for Garfinckel's to participate in a store promotion during the month of March 1979. He agreed to participate without compensation in a program entitled, "Creams versus Plastic Surgery," a topic chosen by Garfinckel's partly as a result of recent publicity about the plastic surgery operations of the wives of Presidents Ford and Carter. In connection with its promotion and prior to the presentation at Garfinckel's, Garfinckel's arranged to have Dr. Magassy and other participants appear on the "Panorama" television program on WTTG, Channel 5, in Washington, D.C.

During his television presentation, Dr. Magassy used slide photographs of several of his patients, including two "before" and two "after" of Mrs. Vassiliades. Although Mrs. Vassiliades' face appeared on the television screen for less than one minute and her name was not mentioned, a former coworker, Beatrice Brooks, recognized her. Mrs. Brooks testified she had not previously known about Mrs. Vassiliades' surgery and after seeing Mrs. Vassiliades' photographs during the television program, she immediately called a friend at work to share this information. The coworker whom Mrs. Brooks called told another employee, Elliott Woo, a neighbor of Mrs. Vassiliades, but he already knew. Three days later Dr. Magassy made a similar presentation at Garfinckel's department store; seventy-nine people were in the audi-

ence, but no evidence was presented that anyone there recognized Mrs. Vassiliades' photographs.

Mrs. Vassiliades learned about the presentations on April 1, 1979. She testified that when she learned of the disclosure she was "devastated," "absolutely shocked" and "felt terrible" that everyone at her former office knew about her face-lift. She "went into a terrible depression," and did not want to go out in public anymore. She claimed she virtually went into hiding and refused to accompany her husband to many places because she knew everyone talked about her cosmetic surgery.

The key issue at trial was whether Mrs. Vassiliades had consented to the use of her photographs by Dr. Magassy. She categorically denied that she had. Dr. Magassy contended that he had obtained her verbal consent: on two occasions she had expressed her willingness to help him in any way she could with other patients who might be contemplating plastic surgery, and on her last visit she had told him that he could use her photographs in his lectures or in any other way to help other patients. Dr. Magassy's former assistant office manager corroborated his testimony about Mrs. Vassiliades' verbal consent.

## II

Mrs. Vassiliades alleged that her right to privacy was violated because unreasonable publicity was given to her private life, her photographs were used for commercial gain by the defendants, and she was portrayed in a false light. Her additional claim for breach of a fiduciary duty was also a part of her invasion of privacy claim. RESTATEMENT (SECOND) OF TORTS § 652A, at 377–78 (1977) (although plaintiff may maintain invasion of privacy cause of action on several theories, she is entitled to only one recovery of damages). Accordingly, if the trial court erred in ruling against Mrs. Vassiliades on any of the grounds she alleges as a basis for invasion of privacy, the entry of judgment notwithstanding the verdicts

or directed verdicts on the invasion of privacy cause of action must be reversed.

A directed verdict and a judgment notwithstanding the verdict are appropriate to "remove from jury consideration those cases in which the facts, viewed most favorably to the nonmoving party, permit but one reasonable conclusion as to the proper judgment." *District of Columbia v. Cassidy,* 465 A.2d 395, 397 (D.C.1983); *Papanicolas v. Group Hospitalization, Inc.,* 434 A.2d 403, 404 (D.C.1981); *Faniel v. Chesapeake & Potomac Telephone Co.,* 404 A.2d 147, 150 (D.C.1979). On appeal, this court must apply the same standard as the trial court in considering whether a jury could reasonably reach a verdict in favor of the opponent of the motion. *District of Columbia v. Cassidy, supra,* 465 A.2d at 397; *Faniel v. Chesapeake & Potomac Telephone Co., supra,* 404 A.2d at 150 (citing *Baker v. D.C. Transit System, Inc.,* 248 A.2d 829, 831 (D.C.1969)).

In its Memorandum Opinion and Judgment the trial court held that the right of privacy is not absolute and that, in balancing the individual's right to be let alone and the public's right to know, there are occasions on which the public right must prevail. We agree. We also agree that the precise boundaries of the public interest may be exceedingly difficult to define, that the subject matter of plastic surgery, as the trial court noted, "at a time when many well-known and highly visible men and women were the objects of news articles about face-lifts and other plastic surgery" was of general public interest, and that a professional presentation with photographs would enhance the public interest in the subject. We disagree, however, with the trial court's conclusions that "reasonable minds could not differ in finding the publication [of Mrs. Vassiliades' photographs] to be of legitimate public interest," and that "certainly, the subject of face-lifts and plastic surgery was no longer a subject calculated to generate offense to persons of ordinary sensibilities." We hold Mrs. Vassiliades was entitled to expect photo-

graphs of her surgery would not be publicized without her consent.

The concept of a cause of action for invasion of privacy is generally considered as having originated with a law review article written in 1890 by Samuel D. Warren and Louis D. Brandeis. *See generally,* Warren & Brandeis, *The Right to Privacy,* 4 HARV.L.REV. 193 (1890). In their article, the authors described the cause of action as the right "to be let alone." Since then, the tort of invasion of privacy has been expanded considerably, but as Professor Prosser noted, much debate has always existed over the definition and scope of the "right of privacy." *See generally,* W. PROSSER, LAW OF TORTS, § 117 (4th ed. 1971). Professor Prosser categorized four distinct kinds of invasions: (1) intrusion upon one's physical solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places someone in a false light in the public eye; and (4) appropriation of one's name or likeness for another's benefit. *Id.* This formulation has been widely accepted by courts and adopted by the American Law Institute (ALI) as its general statement of the law. *See* RESTATEMENT, *supra,* § 652A.

The District of Columbia has long recognized the common law tort of invasion of privacy. *Afro-American Publishing Co. v. Jaffe,* 125 U.S.App.D.C. 70, 74, 366 F.2d 649, 653 (1966) (en banc); *Bernstein v. National Broadcasting Co.,* 129 F.Supp. 817, 829–31 (D.D.C.1955), *aff'd,* 98 U.S.App. D.C. 112, 232 F.2d 369, *cert. denied,* 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956); *Peay v. Curtis Publishing Co.,* 78 F.Supp. 305, 309 (D.D.C.1948). In so doing, the courts have adopted the RESTATEMENT formulation of the "right of privacy." *Afro-American Publishing Co. v. Jaffe, supra,* 125 U.S.App.D.C. at 74 n. 5, 366 F.2d at 653 n. 5 (citing RESTATEMENT OF TORTS § 867 (1938), Interference with Privacy); *Bern-*

*stein v. National Broadcasting Co., supra,* 129 F.Supp. at 826 (same); *Peay v. Curtis Publishing Co.,* 78 F.Supp. at 309 (same). This court has relied on the RESTATEMENT'S (SECOND) formulation of the law applicable to "invasion of privacy" in determining the appropriate contours of a cause of action for invasion of that right, *Harrison v. Washington Post Co.,* 391 A.2d 781, 784 (D.C.1978) (citing RESTATEMENT, *supra,* § 652D comment b and comment f—publicity of private facts), and we do so here.

### A.

■■■ The RESTATEMENT, *supra,* § 652D, recognizes that publicity of a private matter may constitute an invasion of privacy.[1] The drafters contemplated that "any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity" to the private life of a person. *Id.,* comment a. The determinative factor is whether the communication is public as opposed to private. Mrs. Vassiliades offered evidence that, after agonizing over losing her youthful appearance and contemplating plastic surgery for many years, she underwent plastic surgery and kept her surgery secret, telling only family and very intimate friends.

■■■ In this jurisdiction, a cause of action for the invasion of privacy "represents a vindication of the right of private personality and emotional security." *Afro-American, supra,* 125 U.S.App.D.C. at 74, 366 F.2d at 653. Publication of a photograph of a nonpublic person without his consent is a violation of that right. *Peay v. Curtis Publishing Co., supra,* 78 F.Supp. at 309. While we recognize that the right is not absolute, we agree with the Supreme Court of Missouri that "[c]ertainly if there is any right of privacy at all, it should include the right to obtain medical treat-

---

1. The RESTATEMENT, *supra,* § 652D, provides:
 One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

 (a) would be highly offensive to a reasonable person, and
 (b) is not of legitimate concern to the public.

ment at home or in a hospital for an individual personal condition (at least if it is not contagious or dangerous to others) without personal publicity." *Barber v. Time, Inc.*, 348 Mo. 1199, 1206, 159 S.W.2d 291, 295 (1942).

We find the analysis in *Barber v. Time* persuasive, although the issue in that case differed from the issue before us. The Missouri Supreme Court faced the question of whether the media, which enjoys a broader protection than the average person, had invaded the plaintiff's right to privacy in publishing certain photographs of her. The plaintiff claimed her privacy had been invaded because a magazine had published an article, using her name and picture, about an unusual physical ailment for which she had been hospitalized and was being treated. In upholding the jury's finding that the plaintiff's privacy had been invaded, the Missouri Supreme Court held that "[w]hile plaintiff's ailment may have been a matter of some public interest because unusual, certainly the identity of the person who suffered this ailment was not." *Id.* The court's decision, however, did not turn on the identification of plaintiff by name; the court was concerned primarily with the individual patient's right to privacy, recognizing that for a physician effectively to treat a patient, the patient frequently is required to divulge "information which it would be both embarrassing and harmful to have circulated generally throughout the community." *Id.*

▮▮▮▮ This is precisely what happened to Mrs. Vassiliades. Medical information which was embarrassing and emotionally distressing to her was broadcast on television and to a large audience. Publicizing the photographs as part of a presentation on plastic surgery communicated private facts about Mrs. Vassiliades' life. The nature of the publicity ensured that it would reach the public. *See* RESTATEMENT, *supra*, § 652D comment a (any broadcast over television or publication to large audience sufficient to give publicity). Thus the fact that Mrs. Vassiliades presented only two

witnesses who learned of her plastic surgery from the television show and none who saw the store presentation does not defeat her claim. Nor need her name have been mentioned. *See Peay v. Curtis Publishing Co., supra,* 78 F.Supp. at 306 (invasion of privacy where photograph used without name as illustration in article on taxicab drivers).

▮▮▮▮ The tort of invasion of privacy also requires, however, that the publicity be "highly offensive." RESTATEMENT, *supra*, § 652D comment c. "[T]he claimant [must have] suffered an unreasonable and serious interference with protected interests." *Jackson v. District of Columbia,* 412 A.2d 948, 954 (D.C.1980) (citing *Afro-American v. Jaffe, supra,* 125 U.S.App. D.C. at 75, 366 F.2d at 654). The trial court found that the photographs were not highly offensive because there was nothing "uncomplimentary or unsavory" about them. Although the photographs may not have been uncomplimentary or unsavory, the issue is whether the publicity of Mrs. Vassiliades' surgery was highly offensive to a reasonable person, a factual question usually given to a jury to determine. *See Barber v. Time, Inc., supra,* 348 Mo. at 1206, 159 S.W.2d at 295. "The protection afforded to the plaintiff's interest in his privacy must be relative to the customs of the time and place, to the occupation of the plaintiff and to the habits of his neighbors and fellow citizens." RESTATEMENT, *supra*, § 652D comment c. The jury was instructed that it had to find the publication highly offensive to a reasonable person in order to establish liability; in finding for Mrs. Vassiliades the jury must have specifically made such a finding. In view of the evidence presented to the jury, we find no basis to conclude that it did not follow the instruction. *See Parker v. Randolph,* 442 U.S. 62, 74 n. 6, 99 S.Ct. 2132, 2139 n. 6, 60 L.Ed.2d 713 (1979); *Christian v. United States,* 394 A.2d 1, 23 (D.C.1978).

▮▮▮▮ Appellees also contend, and the trial court found, that the publicity was protected because there was a legitimate

public interest in the publication. It is a defense to a claim of invasion of privacy that the matter publicized is of general public interest. *Pearson v. Dodd,* 133 U.S. App.D.C. 279, 281, 410 F.2d 701, 703, *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969); RESTATEMENT, *supra,* § 652D. Moreover, this defense or privilege is not limited to dissemination of news about current events or public affairs, but also protects "information concerning interesting phases of human activity and embraces all issues about which information is needed or appropriate so that that individual may cope with the exigencies of their period." *Campbell v. Seabury Press,* 614 F.2d 395, 397 (5th Cir.1980) (citing *Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 542, 17 L.Ed.2d 456 (1967) and *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940)); *see also* RESTATEMENT, *supra,* § 652D comment j (involuntary public figure properly subject to public interest). The privilege, which was originally based on common law, RESTATEMENT, *supra,* § 652D comment d, now also stems from the First Amendment which protects what otherwise would be an actionable invasion of privacy.[2] *Gilbert v. Medical Economics Co.,* 665 F.2d 305, 307 (10th Cir.1981); *Campbell v. Seabury Press, supra,* 614 F.2d at 397. This broad privilege would deny a remedy even to persons who have not sought or have attempted to avoid publicity. *See Campbell v. Seabury Press, supra,* 614 F.2d at 397 (citing PROSSER, *supra,* § 118, at 825–26).

▪ Nevertheless, the privilege to publicize matters of legitimate public interest is not absolute. *See Gilbert v. Medical*

*Economics Co., supra,* 665 F.2d at 307. Certain private facts about a person should never be publicized, even if the facts concern matters which are, or relate to persons who are, of legitimate public interest.[3] *Virgil v. Time, Inc.,* 527 F.2d 1122, 1131 (9th Cir.1975), *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976). We thus find persuasive the distinction Mrs. Vassiliades draws between the private fact of her reconstructive surgery and the fact that plastic surgery is a matter of legitimate public interest.

▪ The conflict between the public's right to information and the individual's right to privacy requires a balancing of the competing interests. In this jurisdiction "[t]he right of privacy stands on a high ground, cognate to the values and concerns protected by constitutional guarantees." *Afro-American Publishing Co. v. Jaffe, supra,* 125 U.S.App.D.C. at 75 & n. 8, 366 F.2d at 654 & n. 8; *see Gilbert v. Medical Economics Co., supra,* 665 F.2d at 307. Accordingly, upon balancing the two interests, we hold that Mrs. Vassiliades had a higher interest to be protected. Although Dr. Magassy and Garfinckel's may well have performed a public service by making the presentations about plastic surgery, and the public undoubtedly has an interest in plastic surgery, it was unnecessary for Dr. Magassy to publicize Mrs. Vassiliades' photographs. Publication of her photographs neither strengthened the impact nor the credibility of the presentations nor otherwise enhanced the public's general awareness of the issues and facts concerning plastic surgery. *See Gilbert v. Medical Economics Co., supra,* 665 F.2d at 308

**2.** The First Amendment protection is generally limited to publication by the media; others who claim protection because the matter published is of legitimate public concern are generally limited to protection by the common law. *See Gilbert v. Medical Economics Co., supra,* 665 F.2d at 307 and authorities cited therein; *Logan v. District of Columbia,* 447 F.Supp. 1328, 1333–34 (D.D.C.1978) (applying common law).

**3.** The Tenth Circuit noted in *Gilbert v. Medical Economics Co., supra,* 665 F.2d at 308:

[b]ecause each member of our society at some time engages in an activity that fairly could be characterized as a matter of legitimate public concern, to permit that activity to open the door to the exposure of any truthful secret about that person would render meaningless the tort of public disclosure of private facts. The First Amendment does not require such a result.

(citing RESTATEMENT, *supra*, § 652D comment h). Dr. Magassy's presentations could have been just as informative by using either photographs of other patients or photographs from medical textbooks. The "logical nexus" that courts have relied upon in determining that no liability exists where a matter of legitimate public interest is concerned—here, the nexus between the subject matter and Mrs. Vassiliades' photographs—is missing. *Dresbach v. Doubleday & Co.*, 518 F.Supp. 1285, 1290–91 (D.D. C.1981) (citing *Campbell v. Seabury Press, supra*, 614 F.2d at 397). We hold, therefore, that Dr. Magassy invaded Mrs. Vassiliades' privacy by giving publicity to private facts and the trial court erred in granting his motion for a judgment notwithstanding the verdict.

■ This finding of liability does not compel a like result with respect to Garfinckel's. The undisputed evidence is that Dr. Magassy had unqualifiedly assured Garfinckel's that he had obtained his patients' consent. Clear evidence of consent will insulate a party from liability. *Anderson v. Low Rent Housing Commission of Muscatine*, 304 N.W.2d 239, 251 (Iowa), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981); PROSSER, *supra*, § 117, at 817 and cases cited therein. Thus, the issue is whether Garfinckel's was justified in relying on Dr. Magassy's oral assurance. Garfinckel's decision to ask Dr. Magassy to participate in its program was based on its understanding that he was a reputable professional; Garfinckel's director of public relations testified about Dr. Magassy's prior complimentary public exposure.[4] Before the television program, Garfinckel's director examined each of the slides on a view finder and, upon finding some to be not particularly pleasant, asked

Dr. Magassy if he had obtained permission from his patients to use the slides. Based on Dr. Magassy's assurance that he had, the director did not inquire about consent prior to the department store presentation. No evidence was presented to suggest that Garfinckel's had any reason to doubt Dr. Magassy's statement.

■ Under these circumstances, we hold that Garfinckel's was justified in relying on Dr. Magassy's assurances that he had Mrs. Vassiliades' consent and that Mrs. Vassiliades has failed to meet her burden to prove Garfinckel's liability for invasion of her privacy. *See Dresbach v. Doubleday & Co., supra*, 518 F.Supp. at 1292. Accordingly, we affirm the judgment notwithstanding the verdict for Garfinckel's, although on different grounds than the trial court. *Jones v. District of Columbia*, 123 A.2d 364, 365 (D.C.1956).

### B.

Mrs. Vassiliades also claimed that, in displaying the photographs without her permission, Dr. Magassy breached the confidential doctor-patient relationship. This jurisdiction has not ruled whether the privilege of the physician-patient relationship gives rise to a cause of action. *See Logan v. District of Columbia, supra* note 2, 447 F.Supp. at 1335. In other jurisdictions, in the absence of legislation, courts have found the basis for a right of action for breach of the physician-patient confidential relationship in four main sources of public policy: state physician licensing statutes, evidentiary rules and privileged communication statutes which prohibit a physician from testifying in judicial proceedings, common law principles of trust, and the Hipprocratic oath and principles of medical ethics.[5] *See, e.g., Hammonds v. Aetna*

---

**4.** Dr. Magassy was recommended to Garfinckel's by DOSSIER Magazine, and Garfinckel's understood that he recently had been featured in a NEWSWEEK article and on television performing an operation. He is certified by the American Board of Surgery and by the American Board of Plastic and Reconstructive Surgery and is a member of the American Medical Association,

the American College of Surgeons, the American Society of Plastic and Reconstructive Surgery, and other medical organizations.

**5.** The Hippocratic oath states, in pertinent part: All that may come to my knowledge in the exercise of my profession or outside of my profession or in daily commerce with men,

*Casualty & Surety Co.,* 243 F.Supp. 793, 797 (N.D.Ohio 1965); *Horne v. Patton,* 291 Ala. 701, 704, 287 So.2d 824, 827–32 (1973); *Humphers v. First Interstate Bank,* 68 Or.App. 573, ——, 684 P.2d 581, 585–87 (1984).

 The tort of breach of confidential relationship is generally described as consisting of the "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." Note, *Breach of Confidence: An Emerging Tort,* 82 COLUM.L.REV. 1426, 1455 (1982) [hereinafter Note]. It arises from the limited duty that attaches to "nonpersonal relationships customarily understood to carry an obligation of confidence." *Id.* at 1460 (emphasis omitted). That limited duty conveys a standard that is more strict than the reasonable man test and provides fair warning to potential defendants that "for so palpable a wrong, the law provides a remedy." *Humphers v. First Interstate Bank, supra,* 68 Or.App. at ——, 684 P.2d at 587 (quoting *Smith v. Driscoll,* 94 Wash. 441, 162 P. 572, 573 (1977)). The object of the cause of action based on the breach of confidentiality is not to fulfill expectations, but to compensate the resulting injuries. Note, *supra,* at 1451. And in contrast to the tort of invasion of privacy, which is subject to traditional privileges (such as public safety, fraud, crime, self-defense, and interest of a third person), the First Amendment and the public's right to know, the public-right-to-know privilege of this tort is more restrictive than the broad public interest exception to the common law right to privacy. A defendant is not released from an obligation of confidence

merely because the information learned constitutes a matter of legitimate public interest. *Id.* at 1468. *See generally Doe v. Roe,* 93 Misc.2d 201, 400 N.Y.S.2d 668 (1977).

There exists in this jurisdiction evidence of a strong public policy in favor of confidentiality of physician-patient relationships. The District's licensing statute, D.C.Code §§ 2–1302, –1325 (1981), prohibits the reporting of patient treatment, except in cases involving gun wounds, *id.* § 2–1361, and child neglect. *Id.* § 2–1355. The District of Columbia Code also excludes the in-court testimony of physicians about their patients except in limited situations not relevant here. *Id.* § 14–307. *See also id.* § 6–2002(a). *But see Logan v. District of Columbia, supra,* 447 F.Supp. at 1335 (testimonial prohibition limited to judicial context). These statutes suggest that the policy in this jurisdiction is to encourage candor by patients and confidentiality by physicians. The medical profession has recognized that the relationship between a physician and patient requires that "[t]he confidences ... should be held as a trust and should never be revealed except when imperatively required by the laws of the state." *Principles of Medical Ethics of A.M.A.,* Ch. II, § 1 (1943), *cited in Hammonds v. Aetna Casualty & Surety Co., supra,* 243 F.Supp. at 803.[6] Moreover, in an analogous situation, this court has held that persons who occupy a fiduciary relationship must scrupulously honor the trust and confidence reposed in them because of that special relationship, and that the breach of a fiduciary duty warrants the imposition of damages. *Wagman v. Lee,*

---

which ought not to be spread abroad, I will keep secret and will never reveal.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 609 (26th ed. 1981).

**6.** In *Hammonds,* the court observed:
[the] patient necessarily reposes a great deal of trust not only in the skill of the physician but in his discretion as well. The introduction into the relationship of this aura of trust, and the expectation of confidentiality which results therefrom, imposes the fiduciary obli-

gation upon the doctor.... [T]he imposition of a trustee's duties upon a physician ... [is not a] new doctrine in America, [for] [b]y its very definition, the term "fiduciary relationship" imports the notion that "[i]f a wrong arises, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the *cestui que trust.*"
243 F.Supp. at 802–03 (citations omitted).

457 A.2d 401, 405 (D.C.) (escrow agent has fiduciary relationship of trust and confidence with prospective buyer of property and liable for damages upon breach of fiduciary relationship), *cert. denied,* —— U.S. ——, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983).

Surely it should be no less true for patients receiving medical treatment in the District of Columbia than for those in other jurisdictions that

> confidences made by a patient to a physician may not be disclosed without the permission of the patient. Patients ... have the right to rely on this common understanding of the ethical requirements which have been placed on the medical profession and to obtain damages against a physician if he violates such confidentiality.

*Humphers v. First Interstate Bank, supra,* 68 Or.App. at ——, 684 P.2d at 587. We hold that the breach of a physician-patient relationship is an actionable tort. This conclusion is consistent with the public policy in this jurisdiction in favor of confidentiality of the physician-patient relationship and the principle enunciated in *Wagman v. Lee, supra,* 457 A.2d at 404. However, since Mrs. Vassiliades maintained that she did not assert her claim of breach of the confidential relationship as an independent cause of action, but only as a separate theory of invasion of privacy, the error in directing the verdict for Dr. Magassy is harmless because she recovered on her other theories and is only entitled to a single recovery for the wrong alleged.

**C.**

We affirm the judgment notwithstanding the verdict on Mrs. Vassiliades' claim that appellees used her likeness for their commercial benefit and the directed verdict on her claim that her photographs were publicized in a manner that would place her in a false light.[7] Incidental use of name or likeness or publication for a purpose other than taking advantage of a person's reputation or the value associated with his name will not result in actionable appropriation. *Moglen v. Varsity Pajamas, Inc.,* 13 A.D.2d 114, 115, 213 N.Y. S.2d 999, 1001 (1961); RESTATEMENT, *supra,* § 652C comment d. While the record clearly establishes that appellees used Mrs. Vassiliades' photographs for their own benefit, Mrs. Vassiliades has not shown there was a public interest or other value in her likeness. RESTATEMENT, *supra,* § 652C comments a and b. Therefore, appellees' use of Mrs. Vassiliades' photographs was not an appropriation for commercial benefit within the meaning of this tort.

With respect to the false light claim, Mrs. Vassiliades presented no evidence that appellees misrepresented her character, activities or beliefs, *see Harrison v. Washington Post Co., supra,* 391 A.2d at 783–84 & n. 8; RESTATEMENT, *supra,* § 652E comment c, or that Dr. Magassy took any action to place Mrs. Vassiliades in a false light within the meaning of this tort. No claim was made that the use of her photographs gave the false impression that she was endorsing appellees or anticipating personal financial benefit from the presentations, nor that the photographs did

---

7. Appellees contend the trial court improperly allowed Mrs. Vassiliades to present evidence on the false light claim. Mrs. Vassiliades first alleged it in a motion for leave to file an amended complaint, which the record does not indicate was granted. However, in view of the manner in which the trial judge allowed this case to proceed, we conclude that he either impliedly granted the motion or viewed the original complaint as sufficiently broad to encompass the false light theory, and broadly interpreted the theories of liability stated in the pretrial order. *See* Super.Ct.Civ.R. 15; *Goldkind v. Snider*

Bros., Inc., 467 A.2d 468, 474 (D.C.1983); *Gordon v. Raven Systems & Research,* 462 A.2d 10 (D.C.1983). Parties are generally bound by the pretrial order. *Clarke v. District of Columbia,* 311 A.2d 508, 511 (D.C.1973); *Redding v. Capitol Cab Co.,* 284 A.2d 54, 55 (D.C.1971). Appellees were not surprised by any invasion of privacy theory presented during the trial, and upon review of a judgment notwithstanding the verdict, this court will liberally construe the pleadings. *Washington Herald Co. v. Berry,* 41 App.D.C. 322, 338 (1914).

not resemble her. Rather, Mrs. Vassiliades testified that the photographs did not accurately portray the way she wore her hair and makeup because Dr. Magassy manipulated the lighting while taking the "before" and "after" pictures. Even if these facts were proven, they would not serve as the basis for an actionable false light claim. *See Harrison v. Washington Post Co., supra,* 391 A.2d at 783–84; *Dresbach v. Doubleday & Co., supra,* 518 F.Supp. at 1291–92; RESTATEMENT, *supra,* § 652E.

### III

Mrs. Vassiliades also contends the trial court erred in directing a verdict for appellees on punitive damages, and in finding the damages excessive and granting the alternative motion for a new trial, in the event the judgment for defendants should be reversed on appeal, on the basis that the verdicts were against the weight of the evidence, contrary to the evidence, and excessive.[8]

### A.

The purpose of punitive damages is to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights. *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982); *Mendes v. Johnson,* 389 A.2d 781, 793–93 (D.C.1978) (en banc) (citing PROSSER, *supra,* § 2, at 9–10); *see also Wagman v. Lee, supra,* 457 A.2d at 405 (breach of fiduciary duty may warrant imposition of punitive damages) (citing *Brown v. Coates,* 102 U.S.App.D.C. 300, 304, 253 F.2d 36, 40 (1958)). Courts do not favor punitive damages, *Sere v. Group Hospitalization, Inc.,*

*supra,* 443 A.2d at 37, and any award of punitive damages must be supported by the evidence of record and the law. *Biggs v. Stewart,* 361 A.2d 159, 164 (D.C.1976). A trial court, therefore, must determine whether a sufficient legal foundation exists to award punitive damages. *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834, 842–43 (D.C.1980). Direct evidence of malicious intent is not required; malice and wrongful motive may be inferred from the acts of a party and circumstantial evidence. *Franklin Investment Co. v. Homburg,* 252 A.2d 95, 98 (D.C.1969); *Washington Herald Co. v. Berry, supra,* 41 App.D.C. at 341 (quoting *Bailey v. Holland,* 7 App.D.C. 184, 189 (1895)) ("malice consists in doing intentionally and without justification that which must work injury to another").

The trial court found that there was insufficient evidence to submit the issue of punitive damages to the jury, and we agree. There was no evidence that Dr. Magassy's conduct was outrageous or that he evidenced an evil motive or a careless or reckless indifference for Mrs. Vassiliades' rights. *Wagman v. Lee, supra,* 457 A.2d at 405; RESTATEMENT, *supra,* § 908(2). Instead, the evidence suggests Mrs. Vassiliades and Dr. Magassy did not mutually understand the limits of Mrs. Vassiliades' statement that he could show her photographs to prospective patients. Since we hold that there was no basis for an award of compensatory damages against Garfinckel's, there is also no basis for punitive damages. *Bay General Industries, Inc. v. Johnson,* 418 A.2d 1050, 1058 n. 21 (D.C. 1980); *Franklin Investment Co. v. Smith,* 383 A.2d 355, 358 (D.C.1978).

8. We find no merit to Mrs. Vassiliades' contention that the trial court erred in ruling on both the motion for a judgment notwithstanding the verdict and, alternatively, the motion for a new trial. Super.Ct.Civ.R. 50(c); *Spain v. McNeal,* 337 A.2d 507, 511 (D.C.1975); *Cox v. Pennsylvania R.R. Co.,* 120 A.2d 214, 217 (D.C.1956). We may review the action of the trial court on both motions. *Hines v. Safeway Stores, Inc.,* 379

A.2d 1174, 1176 (D.C.1978) and authorities cited; *Cox v. Pennsylvania R.R. Co., supra,* 120 A.2d at 217. When a judgment notwithstanding the verdict is reversed, this court may also reverse the conditional grant of the new trial and direct that judgment be entered on the verdict. Super. Ct.Civ.R. 50(c); *see* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: Civil § 2540 n. 11 (1971).

### B.

In determining whether a verdict was excessive, the trial court must consider whether the verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements. *Spar v. Obwoya,* 369 A.2d 173, 180 (D.C.1977); *May Department Stores Co. v. Devercelli,* 314 A.2d 767, 775 (D.C.1973). Alternatively stated, the test is whether the verdict is " 'beyond all reason, or . . . is so great as to shock the conscience.' " *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 687 (D.C.1977) (quoting *Williams v. Steuart Motor Co.,* 161 U.S.App.D.C. 155, 166, 494 F.2d 1074, 1085 (1974)). In reviewing a grant of a new trial for an excessive verdict, we do not apply the same standard. *Taylor v. Washington Terminal Co.,* 133 U.S.App.D.C. 110, 114, 409 F.2d 145, 149, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969).

In this jurisdiction appellate courts accord great deference to a trial judge's view that a verdict is outside the proper range, *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 864 (D.C.1982); *Taylor v. Washington Terminal Co., supra,* 133 U.S.App.D.C. at 114, 409 F.2d at 149, and will reverse the grant of a new trial for an excessive verdict "only where the quantum of damages found by the jury was *clearly* within 'the maximum limit of a reasonable range.' " *Taylor v. Washington Terminal Co., supra,* 133 U.S.App.D.C. at 114, 409 F.2d at 149, *quoted in Hines v. Safeway Stores, Inc., supra,* 379 A.2d at 1176. Close scrutiny of the trial court's grant of a new trial by the appellate court is required in order to protect the litigant's right to a jury trial. *Id.* at 113 n. 13, 409 F.2d at 148 n. 13 (citing *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 90 (3d Cir.), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)).

A plaintiff whose private life is given publicity may recover damages for the harm to her reputation or interest in privacy resulting from the publicity and also for the "emotional distress or personal humiliation . . . if it is of a kind that normally results from such an invasion and it is normal and reasonable in its extent." RESTATEMENT, *supra,* § 652H comment b. Actual harm need not be based on pecuniary loss, and emotional distress may be shown simply by the plaintiff's testimony. *Id.,* comment a. Proof of special damages is not required. *See Bernstein v. National Broadcasting Co., supra,* 129 F.Supp. at 834. Because the damages arising from the tort constitute psychic and emotional harm and the tort is defined in terms of the mores of the community, RESTATEMENT, *supra,* § 652D comment h, mental distress lawsuits offer the potential for large verdicts, although little objective evidence is available to test the size of a jury award for mental distress. *See* PROSSER, *supra,* § 117, at 815. *Compare District of Columbia v. Gandy,* 450 A.2d 896, 901–02 (D.C.1982), *reh'g en banc denied,* 466 A.2d 851 (D.C.1983).

Although we hold that Mrs. Vassiliades presented sufficient evidence of an invasion of privacy, it does not necessarily follow that the trial court abused its discretion in ruling that the verdicts were contrary to the weight of the evidence. *See Baber v. Buckley,* 322 A.2d 265, 267 (D.C.1974). In any event, the question remains whether the trial court abused its discretion in granting a new trial on the grounds that the verdict was excessive. *Cf. Phillips v. District of Columbia,* 458 A.2d 722, 724–25 & n. 2 (D.C.1983) (damages excessive in false arrest case where appellant presented no evidence of mental anguish and humiliation).

The evidence at trial relating to the extent of the injury suffered by Mrs. Vassiliades showed that her photograph was on television for less than 40 seconds, her name was not mentioned and the person in the photograph was referred to only as a patient in her forties. Only one person who saw the television program identified her and that person told one of Mrs. Vassiliades' former coworkers about her surgery. Although most of Mrs. Vassiliades'

testimony focused on the television presentation, she also offered evidence that seventy-nine people saw her photograph at the department store presentation. However, her name was not mentioned; only one person at the store presentation knew her, and there was no evidence that anyone recognized her photographs. There was also evidence that a neighbor, who was also a former coworker, knew about her surgery before Dr. Magassy's presentations. Mrs. Vassiliades did not offer evidence of the impact of the publicity on the persons who saw her photographs, but only described her own mental and behavioral reactions. Her husband corroborated her behavioral reactions, but no medical evidence was offered to support her claim of severe depression. The jury was instructed that Mrs. Vassiliades sought recovery for only a sixty-day period,[9] was cautioned to base its verdict solely on the evidence before it, and was told that it could not award any speculative damages.

█ Viewing this evidence most favorably to Mrs. Vassiliades, see 6A J. MOORE, J. LUCAS & G. GROTHEER, JR., MOORE'S FEDERAL PRACTICE ¶ 59.08[6] (2d ed. 1984), we must still give "considerable deference" to the trial court's finding that the verdict is outside the proper range. Such deference is founded on the fact that trial courts have historically given great weight to jury verdicts, granting a new trial only where there are unusual circumstances which convince the trial judge, who has also heard the evidence and seen the witnesses, that the jury had been improperly influenced by nongermane factors or that its verdict is clearly unreasonable. Thus when the question of excessiveness is close, appellate courts give the benefit of every doubt to the trial court's judgment. *Dagnello v. Long Island Railroad Co.*, 289 F.2d 797, 806 (2d Cir.1961). Upon consideration of the nature of Mrs. Vassiliades' evidence and her stipulated limitation on her claim for damages, we cannot say the trial court's grant of a new trial was so beyond the range of reason as to require reversal. The verdicts for a sixty-day period of $350,-000 against Dr. Magassy and $250,000 against Garfinckel's are at least at the outer limits of the maximum range of a reasonable verdict.

Accordingly, the judgment is affirmed in part, reversed in part, and the case is remanded for a new trial on damages to be assessed against Dr. Magassy.

NEWMAN, Associate Judge, concurring:

What the role of a judge of the trial court is when deciding the grant or denial of a motion for new trial on the grounds of an excessive verdict in light of the Seventh Amendment to the Constitution, is far from clear. *See* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2818–2820 (1976); 6A J. MOORE, J. LUCAS & G. GROTHEER, MOORE'S FEDERAL PRACTICE ¶ 59.08 (2d ed. 1984). The role of an appellate court is even more murky. *Id.* The Supreme Court has left the matter rather opaque. *Compare Metropolitan Railroad Co. v. Moore*, 121 U.S. 558, 7 S.Ct. 1334, 30 L.Ed. 1022 (1887); *Southern Railway Co. v. Bennett*, 233 U.S. 80, 34 S.Ct. 566, 58 L.Ed. 860 (1914); *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933), with *Affolder v. New York, C. & St. L. R.R. Co.*, 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950). *Neese v. Southern Railway Co.*, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955), and *Grunenthal v. Long Island Railroad Co.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968). One thing is clear to me. All judges should be *exceedingly reluctant* to set aside jury verdicts as excessive or to remit them in the face of the constitutional right to jury trial. Given the current state of the law in this whole area, I will leave to a later day and case, further exploration of the subject.

I concur in the judgment of the court.

---

**9.** By stipulation, Mrs. Vassiliades claimed damages for only the sixty-day period, March 26, 1979 to May 26, 1979, following the department store presentation.