Ernest C. SUESBURY, Appellant,

v.

Cesar A. CACERES, M.D.,
et al., Appellees.

No. 01–CV–1456.

District of Columbia Court of Appeals.

Argued Nov. 8, 2002.

Decided Jan. 22, 2004.

Boniface K. Cobbina for appellant.

Robert C. Maynard, with whom Kenneth Armstrong was on the brief, for appellees.

Before STEADMAN, FARRELL and RUIZ, Associate Judges.

STEADMAN, Associate Judge:

Ernest C. Suesbury ("Suesbury") was diagnosed with the HIV virus. Cesar A. Caceres, M.D. ("Caceres"), a principal in the medical office of Cesar Caceres, M.D., P.C., was Suesbury's treating physician, and, as such, was privy to Suesbury's HIV status. Suesbury sought treatment from Caceres for unrelated injuries sustained in an automobile accident. Alfred Muller, M.D. ("Muller"), another physician in Caceres' medical office, treated Suesbury during that office visit, in the course of which Suesbury mentioned his HIV condition and a T-cell reading of 700. Suesbury later alleged to Caceres that Muller molested him during this office visit. Following their conversation, Caceres wrote a memorandum to Muller in which he not only discussed Suesbury's allegation, but also indicated that Suesbury was HIV-positive and that Suesbury's T-cell count was 600.

When he learned of this communication by Caceres to Muller, Suesbury filed suit against Caceres and his medical office, claiming breach of the confidential physician-patient relationship and related torts. Appellees Caceres and his medical office moved for summary judgment. The trial court ruled that, on the undisputed facts, appellees had not breached the confidential relationship and granted the motion. We affirm.

## I. Facts

Caceres practices as an internist and maintains a medical office in Washington, D.C. In 1988, Caceres hired Muller, a board certified internist, to work at his medical office. Caceres first examined appellant on January 15, 1988. Suesbury informed Caceres that he was HIV-positive, a fact that was then noted in Suesbury's medical chart. On May 26, 1992, Suesbury returned to Caceres' medical office for an examination and for treatment of injuries suffered during an automobile accident. Because Caceres was unavailable, Muller examined Suesbury. Prior to examining Suesbury, Muller reviewed Suesbury's chart and learned that he suffered from HIV. Suesbury, during his examination, also disclosed to Muller that he was HIV-positive and that his T-cell count was 700.

Suesbury alleged in his complaint that, during this May 26, 1992 examination, Muller sexually molested him. Following that examination, Suesbury, apparently by telephone and in writing, communicated his allegation to Caceres. Caceres indicated that he would investigate the matter and report back to Suesbury. In a memorandum dated September 2, 1992, Caceres told Muller:

> The message attached is from a patient that called to say that he had been massaged and molested sexually during his visit of 5–26.

> I indicated no similar complaint had come thru regarding any other patient seen but would discuss it with you, and call him back. He says he had spoken to a social worker regarding the situation but had decided not to take the matter further. But I was not able to understand fully why he was calling now or whether he wanted some action taken.

> I do not recall the patient since he had been here only in 1988. His reference tho, I think, (Mr. Hooker), had been in several times but I would have to look this up. PT HIV status was + in Jan of 88 so I would assume that altho his T 4s are 600 according to his report (NIH) he should be getting to some point at which he will have some difficulty with HIV.

> Please let me know what to tell him regarding his complaint.

On or about February 1, 2001, Suesbury discovered through the media that Muller had been arrested and charged with sexually abusing a 14 year old boy. Suesbury then contacted the Assistant United States Attorney ("AUSA") managing the case against Muller and relayed to her the alleged events of May 26, 1992. As part of the investigation in the on-going criminal case against Muller, the AUSA obtained the September 2, 1992 note from Caceres to Muller, forwarding it to Suesbury.

On May 4, 2001, Suesbury filed suit against Caceres and his medical office, alleging breach of the confidential physician-patient relationship, intentional infliction of emotional distress, invasion of privacy, and negligent hiring and supervision. On June 29, 2001, appellees moved for summary judgment, arguing that no issues were in dispute as to any material fact and that appellees were entitled to judgment on all counts as a matter of law, which the trial court granted.

On appeal, Suesbury challenges the grant of summary judgment insofar as it relates to the claims for breach of the confidential physician-patient relationship and intentional infliction of emotional distress.

## II. Confidential Physician–Patient Relationship

The tort of breach of the confidential physician-patient relationship was first recognized in this jurisdiction in the leading case of *Vassiliades v. Garfinckel's, Brooks Bros., Miller & Rhoades, Inc.*, 492 A.2d 580, 591–92 (D.C.1985). The tort reflects the strong public policy in the District of Columbia to encourage candor by patients and confidentiality by physicians. *Id.* at 591 (noting that such a public policy is reflected in the District's statutory privilege that prevents physicians from testifying about their patients' medical conditions without their consent as well as certain licensing statutes).[1] To be actionable, a claim for breach of the confidential physician-patient relationship requires the "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 950–51 (D.C.2003) (citing *Vassiliades*, 492 A.2d at 591).[2] The critical question in this appeal, then, is whether Dr. Caceres's disclosure to a fellow physician in his office in the course of dealing with a matter related to the operation of that office was an "unconsented, unprivileged disclosure to a third party." We hold that it was not.

We have not been cited to, nor ourselves found, any case in this jurisdiction, or elsewhere, that squarely addresses the question whether communications between two physicians within the same medical office concerning a patient of that office can con-

1. In *Vassiliades*, we also noted that this tort reflects a bedrock principle within the medical profession itself to hold the confidences of patients as a trust, and that the tort derives, in part, from the fiduciary relationship that exists between physician and patient. 492 A.2d at 591.

2. Subsequent to oral argument, but prior to the disposition of this appeal, the Department of Health and Human Services published the Health Insurance Portability and Accountability Act Standards for Privacy of Individually Identifiable Health Information ["Privacy Rule"] (codified at 45 C.F.R. § 160, 164(A) & (E) (2003)). Under the Privacy Rule, which represents the most stringent federal regulations to date concerning the privacy of health information, a medical office's "permitted uses and disclosures" of protected health information, such as Suesbury's medical condition and T-cell count, include disclosure or use "for its own treatment, payment, or health care operations." 45 C.F.R. § 164.506(a) & (c)(1) (2003). *See also id.* at 164.501 (defining relevant terms).

stitute a breach of the confidential physician-patient relationship. Cases dealing with invocation of the testimonial privilege, however, support the expectation that there will be interaction among related health care personnel. It is widely acknowledged that the nurse who attends a physician during a consultation or examination, or the technician who makes tests under the doctor's direction, are bound by the privilege. *See, e.g., Shultz v. State,* 417 N.E.2d 1127, 1134 (Ind.App.1981) (technician drawing blood); *Ostrowski v. Mockridge,* 242 Minn. 265, 65 N.W.2d 185, 190–91 (1954) (nurse assisting doctor at examination); *Branch v. Wilkinson,* 198 Neb. 649, 256 N.W.2d 307, 312–13 (1977) (extending privilege to physician's agents); *In re Kathleen M.,* 126 N.H. 379, 493 A.2d 472, 477 (1985) (privilege applies to members of treatment team).[3] These decisions simply reflect the reality of medical practice, where many individuals may work in concert. *Cf. Washington Hosp. Ctr. v. District of Columbia Dep't of Employ-* *ment. Servs.,* 789 A.2d 1261, 1263–65 (D.C. 2002) (observing, in the "chosen physician" context, that frequent, successive referrals are commonplace in modern medical practice).[4]

A similar recognition of the extent and necessity of communication within a professional entity is reflected in available authority[5] relating to the attorney-client privilege as applied to intra-firm communications.[6] *See United States v. Rowe,* 96 F.3d 1294, 1296 (9th Cir.1996) (finding that communications between lawyers in the same firm remain privileged by analogizing such communications to the corporate privilege); *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,* 220 F.Supp.2d 283, 286–87 (S.D.N.Y.2002) (citing cases); *In re Sunrise Sec. Litig.,* 130 F.R.D. 560, 595 (E.D.Pa.1989) (acknowledging that a derivative protection applies to communications that reveal the substance of prior confidential communications from a client to members of the same law firm).[7] Commentators, similarly, have

---

**3.** An early Minnesota case held that, when a patient's physician calls in a consultant physician to aid in diagnosis or treatment, the disclosures remain subject to the privilege. *See Leonczak v. Minneapolis, St. Paul & Sault Ste. Marie Ry. Co.,* 161 Minn. 304, 201 N.W. 551, 552 (1924).

**4.** We limit our holding here, however, to the facts before us, namely, a communication between two physicians working together in the same medical practice, and leave a broader analysis for another day.

**5.** *See* Cathryn M. Sadler, Note, *The Application of the Attorney–Client Privilege to Communications Between Lawyers within the Same Firm: Evaluating United States v. Rowe,* 30 ARIZ. ST. L.J. 859, 860 & n.9 (1998) (stressing the paucity of authority on this subject).

**6.** While the attorney-client privilege is rooted in common law, unlike the physician-patient privilege, which is a statutory creation, *see* note 2, *supra,* there appear to be clear parallels between law firms and medical offices in

this regard as well as the general ethical principle of confidentiality.

**7.** Indeed, as with medical practice, some cases have recognized the application of the privilege to communications beyond a single law firm. *See Mead Data Cent., Inc. v. United States Dep't of Air Force,* 184 U.S.App.D.C. 350, 361, 566 F.2d 242, 253 nn. 21 & 24 (1977) (citing *Burlington Indus. v. Exxon Corp.,* 65 F.R.D. 26, 37 (D.Md.1974) for the proposition that the privilege is not lost because client's attorney consults other attorneys about the subject matter of the communication); *In re Grand Jury Subpoenas Dated March 24, 2003,* 265 F.Supp.2d 321, 324–26, 330 (S.D.N.Y.2003) (noting that, in appropriate circumstances the attorney-client privilege extends to communications involving persons assisting the lawyer in the rendition of legal services and extending this principle to public relations consultants hired for litigation purposes). See also JACK B. WEINSTEIN, 3 WEINSTEIN'S FEDERAL EVIDENCE, § 503.12[1][c] (2d ed. 2002) ("No attempt has been made to distinguish between 'inside'

noted that the privilege should apply to communications between attorneys.

The District of Columbia Rules of Professional Conduct too support the proposition that client information shared among attorneys within a firm is to be expected and remains confidential, an opinion that, in turn, informs our view that communications among physicians in the same medical office enjoy a similar protected status.[8] Rule 1.6, cmt. 10, which concerns the confidentiality of information, states "[u]nless the client otherwise directs, a lawyer may disclose the affairs of the client to partners or associates of the lawyer's firm." Analogously, Rule 1.10, cmt. 6, which discusses imputed disqualification, notes "[t]he rule of imputed disqualification ... gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated." Moreover, Rule 1.10, cmt. 14, highlights that "[p]reserving confidentiality is a question of access to information .... A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients."

We are mindful that the case before us concerns the general duty of a physician to maintain the confidentiality of a patient's medical condition, and not the distinct, albeit related, statutory testimonial privilege, which in general prohibits a physician from testifying as to any confidential information acquired in attending a client in a professional capacity. See D.C.Code § 14–307(a); *Richbow v. District of Columbia,* 600 A.2d 1063, 1068 (D.C.1991). The two are not necessarily co-extensive, since the testimonial privilege of the speaker to remain silent is derivative of the patient's interest while the general confidentiality principle may at times also involve consideration of the propriety of a physician's defensive invocation of a right to communicate free of liability. But the interrelation between the two, both bottomed in the end on client candor and effective medical practice, is sufficient to justify reference to testimonial privilege doctrine in our analysis, as casting some light on the extent to which communications retain their confidential nature, on who may legitimately be considered a third party, and on what general expectations of confidentiality can be expected by a patient.

It is true that, in the case before us, the communication was not made in connection with the immediate on-going treatment of a common patient. Nonetheless, the communication was related to and arose as a consequence of such medical treatment and was made in the course of the business of administering the mutual medical practice. Doctors within the same medical office should be allowed to work together with some latitude of freedom of communication not only to treat patients, but also to respond to patient administrative requests and, as here, patient complaints.

Both doctors, moreover, already knew of appellant's HIV-positive status as a result

---

and 'outside' counsel for a corporation."); PAUL R. RICE, ATTORNEY–CLIENT PRIVILEGE IN THE UNITED STATES, § 4.5 (2d ed.1999)

8. The ethical obligations these rules establish extend beyond the scope of the attorney-client privilege, a fact that adds to their educative value here. *See, e.g., In re Edward Gonzalez,* 773 A.2d 1026, 1031 (D.C.2001).

of their treatment of appellant. Appellant argues that Muller was not aware of the NIH report of the decline in appellant's T-cell count from 700 to 600, suggesting a worsening of his condition,[9] and communication of that fact was not directly related to his complaint. We do not think that the content of a communication between two doctors in a common medical practice about a matter involving the operation of that practice should be subjected to such a taxing sentence-by-sentence analysis, especially where the challenged statement is itself medical information acquired as part of the firm's practice.[10] Too exacting an approach, requiring the most guarded attention and analysis of the content of each professional exchange, could well hinder the free flow of information within a given medical practice and work ultimately to the detriment of the medical care of the patients of the firm as a whole. Moreover, when the information relating to a patient's medical record is contained in communications between physicians in the same office relating to that mutual patient, present or past, there can be no doubt that the cloak of confidentiality with respect to that record encompasses both physicians, even when the communication does not directly relate to immediate medical treatment. *Cf.* PAUL R. RICE, ATTORNEY–CLIENT PRIVILEGE IN THE UNITED STATES, § 6:31 (2d ed.1999) (noting

in the attorney-client context: "[W]hen the client communication is generally addressed to the law firm, or to the corporation's internal legal department, the fact that lawyers other than the ones working on the particular matter may read it is inconsequential because all attorneys within the firm or legal department would be bound by the privilege not to divulge its contents. Therefore, confidentiality would be presumed for the latter type of communications.").[11]

In summation, Suesbury was a patient of Caceres' medical office. Muller was a treating physician in that office and had been informed that Suesbury was HIV-positive. Muller normally would be expected to have access to Suesbury's medical information, presumably including the NIH report about Suesbury's T-cell count, at least where he did so for the purposes of treatment, payment, or health care operations.[12] Suesbury complained to Caceres about Muller's actions and, without objection by Suesbury, Caceres said he would investigate. In the course of doing so, he naturally communicated with Muller and, in the process, happened to mention one piece of medical information new to Muller, the decrease in the T-cell count. Caceres' communication related to important practice-related concerns that a patient of the medical practice had voiced.

9. He also suggests that Muller may have forgotten about his HIV status between May and September and been reminded of it afresh by Caceres' communication.

10. Indeed, that information was not something that Suesbury himself had directly conveyed to Caceres in a confidential way but rather came from an NIH report and was therefore information already necessarily known to persons outside the Caceres practice.

11. *Cf. Taylor v. United States,* 95 U.S.App. D.C. 373, 376, 222 F.2d 398, 401 (1955) (de-

scribing our then physician patient privilege statute, which remains substantially unchanged, as "very broad" and encompassing "any information obtained by him [physician] in his professional capacity"); *Herbin v. Hoeffel,* 806 A.2d 186, 197 (D.C.2002) (acknowledging, in the attorney-client context, that the attorney-client privilege protects not only client "confidences," but also client "secrets").

12. This is true even under the revised federal regulations. See *supra* Privacy Rule, at § 164.506(c).

In this setting, the single medical statement of a T-cell count contained in a communication relating to firm operations by one physician to another, made within the bounds of a common professional enterprise and a mutual obligation of confidentiality, simply was not the "unconsented, unprivileged communication with a third party" required to underpin the tort.[13] Suesbury thus failed to establish an essential element of his cause of action in tort for breach of the confidential physician-patient relationship. The trial court correctly granted summary judgment against him on that count, as well as the related count for intentional infliction of emotional distress.[14]

*Affirmed.*

---

13. There is no evidence that would create a jury issue on whether Caceres' communication to Muller was motivated by malice or intention to harm Suesbury, factors that might undermine its privileged status.

14. Given the privileged nature of the communication and its cloak of continuing confidentiality, it could not form the basis for the demanding requirements of the tort of intentional infliction of emotional injury. *See, e.g., Paul v. Howard Univ.,* 754 A.2d 297, 307–308 (D.C.2000). Likewise, the amendment of the complaint sought by appellant to separate the

HIV and the T-cell communications into separate counts would be irrelevant to the outcome. *See, e.g., Eskridge v. Jackson,* 401 A.2d 986, 988 (D.C.1979).